Thomas BULLOCK, on behalf of himself and all others similarly situated, Plaintiff,

v.

ADMINISTRATOR OF the ESTATE OF Donald P. KIRCHER, Joseph B. Flavin, Gilbert W. Fitzhugh, Arthur H. Fredston, Edwin J. Graf, William G. Hamilton, Jr., Lloyd L. Kelly, Ian K. MacGregor, James W. McKee, Jr., Donald E. Meads, William H. Morton, Donald G. Robbins, Jr., Arthur J. Santry, Jr., F. Wayne Valley, and the Singer Company, Defendants.

Civ. A. No. 76–1173.

United States District Court, D. New Jersey.

Report and Recommendation Aug. 10, 1979.

Order Adopting Report Aug. 21, 1979.

Joseph F. Greene, Jr., Brown, Connery, Kulp, Wille, Purnell & Greene, Camden, N. J., and Leonard Barrack, Barrack, Rodos & McMahon, Philadelphia, Pa., for plaintiff.

Dickinson R. Debevoise, Riker, Danzig, Scherer, Debevoise & Hyland, Newark, N. J., for Defendant, The Singer Co.

William D. Hardin, Pitney, Hardin & Kipp, Morristown, N. J., for individual defendants.

## REPORT AND RECOMMENDATION

STEPHEN M. ORLOFSKY, United States Magistrate:

On June 21, 1976, the Estate of Henry T. Bullock commenced this action against the Singer Company (Singer) and fourteen individuals who are present and former directors of Singer, alleging violations of the Securities Exchange Act of 1934 (1934 Act), 15 U.S.C. § 78a *et seq.*, and Rule 10b–5, 17 C.F.R. § 240.10b–5 (1978) adopted by the Securities and Exchange Commission (SEC) pursuant to the 1934 Act.[1] On October 19, 1976 B. Krolik filed an action (Civil No. 76–1996) alleging similar violations by Singer and its individual officers. Upon completion of class action discovery, this court entered an order on March 21, 1977 directing that Thomas Bullock be designated as the representative of a class consisting of:

" . . . all those persons who, during the period from October 17, 1973 through December 29, 1975, purchased shares of the Singer Company's (i) Common Stock, par value $10 per share or (ii) 3.50 Cumulative Preferred Stock, stated value $13 per share, and who sustained loss or realized damages as a result of such purchases, except such purchasers (a) who were employees of The Singer Company and who purchased their shares pursuant to a stock option plan, stock purchase plan or executive compensation plan sponsored or adopted by The Singer Company, or (b) who are individual defendants in this action, or (c) who are a spouse, child, parent, brother or sister of an individual defendant in this action." Stipulation And Order As to Class Determination, filed March 21, 1977.[2]

On April 14, 1977 the court entered an order consolidating both cases for all purposes, and directed plaintiffs to file a consolidated complaint. The order of class determination in the Bullock matter was applied in the consolidated action.

After extensive and thorough discovery proceedings had been conducted, the parties entered into a *Stipulation And Agreement of Compromise And Settlement,* dated November 10, 1978.

The essential features of the proposed settlement are:

1. The class represented by Thomas Bullock shall be expanded to include purchasers of Singer's 8% Sinking Fund Debentures due January 15, 1999. The class period is to commence on January 20, 1973 instead of October 17, 1973;

2. Count Two of the Consolidated Complaint setting forth the claim of B. Krolik shall be dismissed without prejudice to Krolik's right to participate in the settlement as a member of the class;

3. Singer shall establish a Settlement Fund of $4,400,000 to be deposited in segregated interest bearing accounts or certificates of deposit. If the settlement is ultimately approved by the court, the fund with accumulated interest shall be distributed as follows: (a) in payment of settlement administration costs in excess of $175,000; (b) in payment of counsel fees, costs, and disbursements of plaintiffs'.counsel to the extent approved by the court; (c)

---

1. Plaintiff's motion to amend the complaint to name Thomas Bullock as plaintiff was granted, and the amended complaint was filed on December 3, 1976.

2. By order entered on November 14, 1978, the class period was redefined as the period from January 20, 1973 through December 29, 1975. The class was also expanded to include purchasers of Singer's 8% Sinking Fund Debentures due January 15, 1999.

the balance to class members who file valid Proofs of Claim;

4. Singer shall establish an Administration Fund of $175,000 to cover the costs of administering the settlement. Any administrative cost in excess of $175,000 shall be paid from the Settlement Fund. If the cost of administering the settlement does not exceed $175,000, the balance remaining in the administration fund, plus any accrued interest shall be returned to Singer;

5. By agreement, and with the court's approval, a settlement administration committee shall be established to: (a) identify members of the class; (b) prepare and publish any notices or proofs of claim required by the agreement; (c) review proofs of claim and pass upon their validity; (d) file with the court a report setting forth those claims which have been allowed or disallowed, and the amounts allowed; (e) distribute the Settlement Fund to claimants found to have presented valid claims;

6. The agreement also provides for the method by which the loss of each member of the class is to be computed, and a procedure for the filing of claims by class members;

7. Defendants do not admit any wrongdoing, and the proposed Settlement, if approved, shall resolve all claims between the parties;

8. If the proposed Settlement is not approved, all funds with accumulated interest shall be returned to Singer, less any amounts used to pay administrative expenses.

In an *Order for Hearing on Settlement Agreement and Related Matters,* dated November 14, 1978, this court directed that notice of the proposed settlement be given to members of the class pursuant to *F.R. Civ.P.* 23(c).[3] Pursuant to the order of November 14, 1978, the hearing to approve the proposed settlement was conducted on April 9, 1979.[4] All parties have submitted briefs in support of the proposed settlement.

## I. THE PROPOSED SETTLEMENT

A. *Principles Governing the Judicial Approval of the Settlement of Class Actions.*

■ The starting point for analysis is *F.R.Civ.P.* 23(e) which provides:

"A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

In reviewing a proposed settlement, a court should not turn the settlement hearing into a trial on the merits. *Newman v. Stein,* 464 F.2d 689, 692 (2d Cir. 1972). As noted in *Jamison v. Butcher & Sherrerd,* 68 F.R.D. 479, 481–82 (E.D.Pa.1975):

"There can be no doubt that a court should disapprove a proposed settlement only with considerable circumspection. The settlement of litigation on terms agreeable to all parties is one of the most important tasks we undertake. (citation omitted). Our judicial system would be severely crippled if courts refused to allow compromise of actions outside the courtroom. In addition, it cannot be disputed that a court should refrain from merely substituting its own judgment of the merits of a settlement for that of counsel intimately associated with the litigation and consequently far more able to weigh its relative strengths and weaknesses. (citation omitted)."

The criteria to be applied in evaluating a proposed settlement were definitively stated in *Girsh v. Jepson,* 521 F.2d 153 (3rd Cir. 1975):

"The decision of whether to approve a proposed settlement of a class action is left to the sound discretion of the district

---

3. On December 1, 1978 an order modifying the November 14, 1978 Order and Stipulation of Agreement of Compromise and Settlement was entered. The substance of the Agreement and Hearing order, however, were not affected.

4. On November 15, 1978 Judge Brotman entered an order of reference directing that I conduct the hearing to approve the proposed settlement and consider any application for counsel fees.

court. Some of the factors which are relevant to a determination of the fairness of a settlement were listed by the Second Circuit in *City of Detroit v. Grinnell Corp.*, 495 F.2d 448 (2d Cir. 1974) as follows:

'. . . (1) the complexity, expense and likely duration of the litigation . . .; (2) the reaction of the class to the settlement . . .; (3) the stage of the proceedings and the amount of discovery completed . . .; (4) the risks of establishing liability . . .; (5) the risks of establishing damages . . .; (6) the risks of maintaining the class action through the trial . . .; (7) the ability of the defendants to withstand a greater judgment; (8) the range of reasonableness of the settlement fund in light of the best possible recovery . .; (9) the range of reasonableness of the settlement fund to a possible recovery in light of all the attendant risks of litigation.' 495 F.2d at 463. (citation omitted)." *Id.* at 156–157.

It is with these criteria in mind that the proposed settlement must be evaluated.

B. *Plaintiff's allegations.*

Paragraphs 13 and 14 of the Consolidated Complaint, filed on April 22, 1977, contain the basic allegations upon which this action is predicated. Paragraph 13 alleges that "during [the class period] some or all of the defendants" conspired to defraud and deceive plaintiff and other members of the class by making ". . . untrue statements of material facts and [omitting] to state other material facts" causing them ". . . to purchase securities of Singer for an excessive consideration during the [class period]." Paragraph 14 sets forth seven "material facts" which defendants allegedly failed to disclose, and one misrepresentation allegedly made.

In relevant part, paragraph 14 provides: "(a) The defendants failed to disclose that Singer had overexpanded and diversified its business interests and activities to such an extent that Singer was unable to effectively manage and control its business operations.

(b) The defendants failed to disclose that Singer had over-extended itself by financing its expansion and diversification by debt rather than equity.

(c) The defendants failed to disclose a number of Singer's product areas and businesses were unprofitable and a drain on its financial resources, including Singer's Water Resources, Tele-Signal products, refrigerator manufacturing, upholstered furniture, European mail order, phototypesetting equipment and business machines divisions.

(d) The defendants failed to disclose the full extent of the losses of Singer's Business Machines Division and the extent to which this division required massive infusions of capital to remain competitive.

(e) The defendants failed to disclose that Singer had sustained excess manufacturing capacity and particularly in the knitting machinery, air conditioning, heating, industrial sewing and furniture areas and that such conditions were causing a substantial drain on Singer's financial resources.

(f) The defendants misrepresented the assets and net worth of Singer by overstating the value of various plants, operating facilities, inventories and receivables.

(g) The defendants failed to adequately disclose in a timely manner the extent to which Singer was required to maintain compensating balances on deposit with its lending banks and that keeping such balances materially increased its effective cost of borrowing.

(h) The defendants failed to disclose that Singer's retail point-of-sale systems and electromechanical billing and accounting product lines were uncompetitive and therefore highly unprofitable."

Discovery in this case has been extensive. Several hundred thousand documents were produced by defendants for examination by plaintiff's counsel. Indeed, document discovery in this case was so voluminous that an order for the preservation of documents was entered to prevent the inadvertent de-

struction of potentially relevant evidence. Twenty-two individuals were deposed beginning on December 29, 1977 and concluding on October 13, 1978. Most of the depositions were conducted in the United States, however, several individuals were deposed in England. In addition, each side propounded and answered several sets of extensive interrogatories. Counsel for all parties have vigorously and skillfully developed the facts which gave rise to this action. The mountain of information produced during discovery stands as a tribute to both the skill and stamina of all counsel. The facts illuminated by the discovery process reveal the following scenario.

Singer commenced its business approximately 125 years ago as a manufacturer and vendor of home sewing machines. In the early 1960's Singer, under the leadership of its Chief Executive Officer, Donald P. Kircher,[5] began a program of diversification which transformed Singer from a single product company into a diversified, multinational corporation.[6] By early 1973, Singer had become involved in the following areas:

1. Consumer Products, which included the manufacture of sewing machines, furniture, and housing;

2. Industrial Products, which involved the manufacture of industrial sewing equipment, gas meters, water pumps and related well equipment and services, switches for consumer appliances and automobile accessories, equipment for aircraft, rail and mass transit;

3. Aerospace and Marine Systems which manufactured navigational and guidance systems, microwave instrumentation products, infrared and electronic intelligence systems and communications equipment;

4. Business Machines, which produced calculators, data processing equipment, computerized billing equipment, and electronic cash registers used as point of sale terminals for retailers;

5. Education and Training Devices, which involved the production of aircraft and spacecraft simulators, closed circuit television equipment, driver training equipment, educational films and slides, and projectors and viewers.

During the class period (January 20, 1973 to December 29, 1975) Singer began to encounter financial difficulties. Such problems were by no means unique to Singer. The United States was experiencing a recession, interest rates increased dramatically, and the dollar declined in value on international money markets. In 1974 Singer took steps to deal with the adverse economic climate. Finally, on December 29, 1975 Singer announced that it was withdrawing from the manufacture and sale of its Business Machine product lines, and was attempting to sell its Business Machine Division. Singer also divested itself of certain other marginal product lines. Furthermore, Singer reported that it was writing off $420 million on its books for 1974 and 1975 discontinuances. After the December, 1975 write-off, Singer announced a net loss for the year 1975 of $451.9 million dollars. Plaintiff's basic premise is that the circumstances leading up to the 1975 write-down were not adequately disclosed to shareholders as required by the 1934 Act and Rule 10b–5.

C. *Risks of Litigation.*

1. *Proof of Liability.*

Perhaps the most difficult hurdle plaintiff would have to overcome to prevail in this matter is proof of *scienter*. In *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976) the Court held that a private cause of action for damages under § 10(b) of the 1934 Act and Rule 10b–5 would not lie absent proof of ". . . 'scienter'—intent to deceive, manipulate, or defraud." 425 U.S. at 193, 96 S.Ct. at 1381.

While plaintiff may have been able to convince a jury of the existence of an intent

5. Donald P. Kircher's untimely death on April 29, 1978 deprived both sides of the testimony of a crucial witness.

6. During the period 1960–1973 Singer acquired approximately 25 different businesses.

to defraud, the task would not have been an easy one. The losses which Singer sustained during the class period may well have been the product of economic forces over which Singer and its management had no control. It was a period of general economic recession, and Singer's efforts to survive in such an economic climate are not to be judged with the benefit of hindsight. Moreover, Singer made a number of disclosures to its shareholders regarding the problems it was encountering. For example Singer's 10–K form filed with the SEC noted:

"In the manufacture and sale of calculators and computer and peripheral products, Singer faces intense price and product competition from major domestic and foreign companies. Substantial expenditures are required in the development of Information Systems products, which products generally are subject to rapid obsolescence."

(December 31, 1972 Form 10–K at p. 2).

Singer had managed to develop a system known as Modular Data Transaction System (MDTS) to be used in retailing as a cash register and a computer terminal. It also developed a computer system to be used in conjunction with MDTS known as System Ten. When these programs began to experience problems, Singer made a series of disclosures designed to explain the reasons for the losses being incurred:

"The $17 million loss in the business machines area during 1971 was largely the result of the Company's decision to press foreward aggressively with engineering, market introduction and service and software support of the MDTS retail information system and other new systems products." (1971 Annual Report at p. 18).

"The loss was reduced from $17.3 million in 1971 to $5.1 million last year." (1972 Annual Report at p. 21).

"In 1973, total sales of information systems and related hardware and software products increased 15.4 per cent to $327.9 million. Earnings were $1.4 million, compared with losses at $5.1 million in 1972 and $17.3 million in 1971." (1973 Annual Report at p. 19).

"A loss of $19.6 million was incurred as compared with a 1973 profit restated to reflect continuing operations of $8 million.

\* \* \* \* \* \*

"Rising interest and materials costs and the slowdown of the United States economy had a severely adverse effect on the Company's information systems business. In addition, revenues diminished over the short term as a result of a major marketing reorganization and discontinuing the electromechanical billing and accounting product line. (1974 Annual Report at p. 18).

"The operations of the Singer Business Machines area were seriously affected by a number of special problems in addition to the general economic conditions mentioned above, and had a very bad year." (May 8, 1975 Report of the Annual Meeting at p. 1).

Furthermore, Singer's decision to discontinue Singer Business Machines (SBM) in December, 1975 was foreshadowed by several of Singer's reports and filings reproduced below:

"The company announced in September, 1974, that it would terminate its electromechanical billing and accounting product line and certain other non-profitable operations and made a special provision of $30 million after taxes for expenses and write-offs relating to these terminations. After the special provision and losses from discontinued operations, there was a net loss for the year of $10.1 million compared with a profit of $94.5 million for the previous year." (January 30, 1975 Press Release at p. 1)

"In 1974, the Company announced that it would terminate its electromechanical billing and accounting line, including the closing of its plant in Nijimegen, The Netherlands and certain other non-profitable operations. In addition, the marketing organization of the Business Machines Division was restructured which had an unfavorable effect in continuing operations in the information systems area in

1974." (December 31, 1974 Form 10–K at p. 9).

Singer's 1974 Annual Report summarized the company's plight:

"The Company had a disappointing year in 1974, reflecting, in part, the most difficult and frustrating economic climate that any of us have recently experienced. The unprecedented combination of escalating inflation, deepening recession and historically high interest costs had a severe adverse effect upon the Company's operations. These were especially pronounced in the last half of the year when the recession deepened and seriously impacted several important sectors of the economy such as appliances, the automotive industry, textiles, housing and housing-related areas in which our Company is significantly involved. In addition, the operations of the Singer Business Machines area were adversely affected by the contraction in its product line as a result of the previously announced decision to terminate the electro-mechanical billing and accounting product line . ."

Finally, on December 29, 1975 Singer made public its decision to discontinue SBM, an announcement which became the centerpiece for this lawsuit:

"Joseph B. Flavin, chairman of The Singer Company, announced today that 'the company has decided to withdraw over the next 12 months from the manufacture and sale of its Business Machines Division product lines, including, retail terminals and data systems.'

" 'Although the potential of the division is still significant, Mr. Flavin said, 'its continued operations are no longer consistent with Singer's overall aims and financial resources.' "

"The Company will include in its 1975 financial statement provisions totalling approximately $400 million for expenses and write-downs related to these decisions. Approximately $325 million of this relates to the Business Machines Division."

\* \* \* \* \* \*

" 'This difficult decision was reached after an extensive review of all our businesses with the primary objective of improving our financial base and redefining the future direction of the company. Essentially, this is a practical economic decision, in view of the substantial losses suffered by the division and the limited availability and high cost of capital.' "

Plaintiff, of course, contends that the disclosures made by Singer, although containing some negative information, were generally optimistic and misleading. Indeed, plaintiff can point to facts unearthed in discovery which might well convince a jury that the disclosures made were inadequate and deceitful. It cannot be denied that this case, if presented to a jury for resolution, could well result in a victory for the class. The likelihood of success, however, is by no means certain. It is well settled that the actions of Singer and its directors may not be viewed in the incandescent light of hindsight. *See Financial Indus. Fund, Inc. v. McDonnell Douglas Corp.*, 474 F.2d 514, 518 (10th Cir. 1973). In short, Singer's actions may not be measured by the standard: "If we only knew then what we know now."

■ There is no evidence whatsoever to indicate that Singer or any of the individual defendants, present and former officers of Singer, derived any personal gain from the alleged failure to disclose. Proof of personal benefit is probative of an intent to deceive, and such evidence, if presented, may lessen the plaintiff's burden of proof at trial. *Monsen v. Consolidated Dressed Beef Company, Inc.*, 579 F.2d 793 (3rd Cir. 1978). The absence of such evidence presents plaintiff both with a more difficult case, and a circumstance which increases the risk of further litigation for the class.

2. *Proof of damages.*

■ The measure of damages for a violation of the 1934 Act is the so called "out of pocket rule." *Estate Counseling Service v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 303 F.2d 527 (10th Cir. 1962); *Beecher v. Able*, 435 F.Supp. 397 (S.D.N.Y.1977). Un-

der that rule, ". . . the defrauded buyer is entitled to recover the difference between the price paid for the securities with interest from the date of purchase, and the value of the securities determined as of the time of discovery of the fraud. In addition, the buyer is entitled to recover any additional outlays attributable to the defendant's conduct . . ." *Esplin v. Hirschi,* 402 F.2d 94, 105 (10th Cir. 1968). In this case, the price of Singer stock rose immediately after announcement of the write-offs on December 29, 1975. In January, 1976 the market price of Singer stock was $9.00. By July, 1976 the market price had risen to over $25.00. Ultimately, the price of Singer stock declined from the July, 1976 level, but it is clear that at trial defendants would contend that after the disclosures were made the fair market value of the Singer stock increased, and plaintiff sustained little, if any, "out-of-pocket" damages. If plaintiff were able to overcome the hurdle of proving damages, it would still be necessary to demonstrate that the alleged fraud proximately caused the out-of-pocket loss. As indicated earlier, the class period was one of general economic decline. It could be argued that since the price of Singer stock rose after the December, 1975 announcement, any reduction in the value of Singer's stock was a product of economic forces, rather than any alleged fraud. Thus, it appears that even if plaintiff were to prove fraud, the issues of damages and proximate cause would still pose formidable barriers to recovery.

D. *Reaction of the Class.*

1. *Contents of the Notice.*

Rule 23(c)(2) of the Federal Rules of Civil Procedure provides in relevant part:

"In any class action maintained under subdivision (b)(3), the court shall direct to the members of the class the best notice practicable under the circumstances, including individual notice to all members who can be identified through reasonable effort. The notice shall advise each member that (A) the court will exclude him from the class if he so requests by a specified date; (B) the judgment, whether favorable or not, will include all members who do not request exclusion; and (C) any member who does not request exclusion may, if he desires, enter an appearance through his counsel."

Rule 23(c)(2) is not discretionary. The mandatory notice requirement was written into the rule to insure that members of a class would be afforded the constitutional imperative of due process. *Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974); *Greenfield v. Villager Industries, Inc.,* 483 F.2d 824 (3rd Cir. 1973). In an effort to comply with the stringent requirements of the Rule, the Singer Settlement Committee contacted the transfer agents of the Singer securities during the class period. The committee was able to obtain all transfer records for all securities covered by the settlement, thereby identifying every purchaser of the securities who might be a potential member of the class. These voluminous records were then placed on a computer to eliminate duplication. As a result of this effort, on January 2, 1979, a total of 43,100 Notices of Class Determination and Settlement were sent to potential members of the class.

In addition to a Notice to purchasers, the committee also mailed a Notice to brokers. Plaintiff obtained from Depository Trust Company, a central clearing house for certain institutional investors in Singer securities, a list of all institutional purchasers of Singer securities during the class period. The Notice to brokers was mailed to each institution identified in this fashion. In addition, the Notice to brokers was mailed to the 200 largest brokerage houses and 100 largest banks in the United States. All institutional nominees who did not respond to the initial broker's notice were sent a second notice on January 15, 1979. Those who did not respond to the second notice were sent a third notice on January 23, 1979. Beginning January 26, 1979 any institutional nominee who had not responded was personally contacted by telephone. An additional 40,000 notices were sent to brokers on behalf of their beneficiaries.

In addition to the mail notice, the notice was published in the National Edition of the New York Times on January 4, 1979, January 11, 1979, January 19, 1979 and in the National Edition of the Wall Street Journal on January 8, 1979, January 11, 1979, January 15, 1979 and January 22, 1979.

The Notice clearly identifies the members of the class, the class period, and the affected securities. It describes the proceedings, and explains the options available to class members under Rule 23(c)(2). It also discusses the terms of the proposed settlement, the manner in which a class member's loss will be calculated, the procedure for filing a claim, and the application for counsel fees and costs.

■ All members of the class have been individually contacted by mail. Notice was published in two national newspapers on seven different occasions. The notice costs to date are in excess of $100,000. Based upon the foregoing, it is apparent that the notice given has been ". . . [the] best notice practicable under the circumstances, including individual notice to all members [of the class] . . ." Rule 23(c)(2); *Eisen v. Carlisle & Jacquelin*, 417 U.S. at 175–76; *Greenfield v. Villager Industries, Inc.*, 483 F.2d at 832.

2. *Class Response.*

■ A significant factor to be considered by a court in evaluating a proposed settlement is the reaction of the class. *City of Detroit v. Grinnell Corporation*, 495 F.2d 448, 462 (2d Cir. 1974); *Seiden v. Nicholson*, 72 F.R.D. 201, 205–06 (N.D.Ill.1976). In this case, the notice to the class provided that objections were to be filed by March 15, 1979. No objections were filed, nor did any member of the class appear at the hearing to approve the settlement conducted on April 9, 1979 to contest the proposed settlement. The absence of any opposition to the settlement takes on an even greater significance in this case because each member of the class received individual notice.

E. *Recommendation of Counsel Based Upon Extensive Discovery.*

■ The settlement in this case was negotiated upon completion of exhaustive discovery. Several sets of voluminous interrogatories were exchanged. Hundreds of thousands of documents were reviewed and twenty-two depositions were conducted. In light of the thorough investigation of the facts, the recommendations of experienced counsel are entitled to great weight. As noted in *Lyons v. Marrud*, 1972–73 CCH Sec.Law Rptr. ¶ 93,525 (S.D.N.Y.1972) at pp. 92, 520:

"This case presents very complex issues of knowledge, intent, materiality and damages. Experienced and competent counsel have assessed these problems and the probability of success on the merits. They have concluded that compromise is well advised and necessary. The parties' decision regarding the respective merits of their positions has an important bearing on this case."

*See also Seiffer v. Topsy's International Inc.*, 70 F.R.D. 622, 626 (D.Kan.1976); *Jamison v. Butcher & Sherrerd*, 68 F.R.D. 479, 481 (E.D.Pa.1975); *Feder v. Harrington*, 58 F.R.D. 171, 175 (S.D.N.Y.1972).

Plaintiff's counsel is an experienced and skillful practitioner in this area of the law. His recommendation that the settlement be approved is *not* to be taken lightly.

F. *Complexity, Expense and Duration of Trial.*

It is clear that the trial of this case would last at least six months. It would involve a tremendous expenditure of resources for both sides. In addition, each side would undertake an inordinately great risk by proceeding to trial. The losing party would undoubtedly appeal, thereby prolonging the proceedings for several years.

■ The expense and risk of litigation often weigh heavily in favor of settlement. As noted by one court:

". . . [T]he Court should consider the vagaries of litigation and compare the significance of immediate recovery by way of compromise to the mere possibili-

ty of relief in the future, after protracted and expensive litigation. In this respect 'It has been held proper "to take the bird in hand instead of a prospective flock in the bush".' " (citations omitted). *Oppenlander v. Standard Oil Company (Indiana)*, 64 F.R.D. 597, 624 (D.Colo.1974). *See also Robertson v. National Basketball Ass'n*, 72 F.R.D. 64, 70 (S.D.N.Y.1976).

In this instance, the expense, complexity, and risk of trial weigh heavily in favor of settlement.

G. *Risk of Decertification of the Class.*

In a case of this nature, a possibility of class decertification always exists. For example, since Singer made many public disclosures, it could be argued that individual shareholders relied upon different disclosures, thereby creating a multiplicity of individual issues.

It is clear that as the trial progressed, defendants would urge such an argument, which if accepted by the court, would effectively defeat all of the class claims. This possibility presents a risk of litigation which plaintiff cannot ignore.

H. *Reasonableness of The Settlement.*

At the hearing to approve the settlement conducted on April 9, 1979, plaintiff presented expert testimony in support of the petition for counsel fees. Melvyn I. Weiss, Esq., senior partner in the firm of Milberg, Weiss, Bershad & Spechthrie, and a specialist in the area of class action securities litigation, testified. In response to a question eliciting his expert opinion on the result obtained by way of settlement, he stated:

"A. Yes. As I ended my last answer, it's an extraordinary one on several counts. One, it is one of the highest ever achieved, not only in this district, but in the United States. We tend to—we practicing in this field tend to look at some of the bigger recoveries when we measure our own performance, but I think that's not the proper way to approach it. There have been thousands of these actions filed throughout the United States since 1966 when Rule 23 was adopted.

Recoveries in the principal amount of approximately $5,000,000.00 are rare. I doubt that I could count more than ten, fifteen such recoveries in the history of the field. Even if the amount of such recoveries were thirty in number, it would certainly be in the top half of one percent of the totality of the actions filed for these types of alleged wrongs. So that in the face of an exceedingly difficult liability case, to have achieved a result that is one of the highest in the history of this type of litigation in the United States, I think was extraordinary." (N.T. at p. 31).

Mr. Weiss' opinion is uncontradicted by any record evidence. Indeed, the lack of opposition by any member of the class to the proposed settlement corroborates his view.

I. *Conclusion.*

■ Having examined the terms of the proposed settlement in light of the principles governing the settlement of class actions, I conclude that the settlement should be approved. This court shall retain jurisdiction for the limited purpose of resolving any disputed claims to the proceeds of the settlement.

## II. THE PETITION FOR COUNSEL FEES

A. *The Societal Value of Class Action Litigation.*

Although enforcement of the Securities Acts is vested in the first instance in the Securities and Exchange Commission, society depends upon private attorneys general to vindicate the policies embodied in the Securities Acts. The class action securities law suit has become a powerful weapon in the arsenal of law enforcement. The classical statement of the principle appears in *Dolgow v. Anderson*, 43 F.R.D. 472, 494 (E.D.N.Y.1968) in which the court noted:

"In some areas of the law, society is dependent upon 'the initiative of lawyers for the assertion of rights' (citations omitted) and the maintenance of desired standards of conduct. The prospect of handsome compensation is held out as an

inducement to encourage lawyers to bring such suits. (citations omitted). The instant case presents a classic example of such a law suit. Quite obviously, a major incentive to forceful prosecution is the substantial counsel fee plaintiffs' attorney believes he may be awarded if he is successful."

It has become increasingly clear that the class action device is a strong deterrent to managerial abuses. Courts have taken a liberal attitude regarding the award of counsel fees in such cases because:

". . . [s]ince in many cases such as this the possibility of recovering attorney's fees will provide the sole stimulus for enforcement . . ." *Angoff v. Goldfine*, 270 F.2d 185, 192 (1st Cir. 1959).

By prosecuting a class action of this nature, plaintiff has challenged a major corporation in the interest of its own stockholders. Plaintiff has brought to light facts which but for the filing of this law suit might well have gone undiscovered. This is particularly significant in a case such as this which was not preceded by any prior governmental investigation or prosecution.

B. *The Lindy Principles.*

 The Court of Appeals for the Third Circuit has developed a considerable body of doctrine in recent years dealing with the issue of attorneys' fees in class actions. The seminal case in this area is *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator & Standard Sanitary Corp.*, 487 F.2d 161 (3rd Cir. 1973). The Third Circuit began by noting:

"In detailing the standards that should guide the award of fees to attorneys successfully concluding class suits, by judgment or settlement, we must start from the purpose of the award: to compensate the attorney for the reasonable value of services benefiting the unrepresented claimant. Before the value of the attorney's services can be determined, the district court must ascertain just what were those services. To this end the first inquiry of the court should be into the hours spent by the attorneys—how many hours were spent in what manner by which attorneys.

\* \* \* \* \* \*

After determining, as above, the services performed by the attorneys, the district court must attempt to value those services.

\* \* \* \* \* \*

The value of an attorney's time generally is reflected in his normal billing rate. A logical beginning in valuing an attorney's services is to fix a reasonable hourly rate for his time—taking account of the attorney's legal reputation and status (partner, associate). Where several attorneys file a joint petition for fees, the court may find it necessary to use several different rates for the different attorneys." 487 F.2d at 167.

The amount thus determined, i. e., the figure obtained by multiplying the number of hours spent by each attorney by the reasonable hourly rate of each attorney, is what has come to be known as the "lodestar." The court in *Lindy* emphasized that the lodestar was to be the basis for the court's fee determination. At least two other factors, however, were to be considered.

"The first of these is the contingent nature of success; this factor is of special significance where, as here, the attorney has no private agreement that guarantees payment even if no recovery is obtained. In assessing the extent to which the attorneys' compensation should be increased to reflect the unlikelihood of success, the district court should consider any information that may help to establish the probability of success.

\* \* \* \* \* \*

The second additional factor the district court must consider is the extent, if any, to which the quality of an attorneys' work mandates increasing or decreasing the amount to which the court has found the attorney reasonably entitled. In evaluating the quality of an attorney's work in a case, the district court should consider complexity and novelty of the issues presented, the quality of the work

that the judge has been able to observe, and the amount of the recovery obtained. This last factor may be the only means by which the quality of an attorney's performance can be judged where a suit is settled before any significant in-court proceedings. In making allowance for the quality of work, the court must keep in mind that the attorney will receive an otherwise reasonable compensation for his time under the figure arrived at from the hourly rate. Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor, or unusually good." *Id.* at 168.

Thus, in what has come to be known as *Lindy I*, the Third Circuit provided a basic framework for determining counsel fees in a class action of this type. *Lindy I* was reaffirmed and amplified in *Lindy Bros. Builders, Inc. of Philadelphia v. American Radiator and Standard Sanitary Corp.*, 540 F.2d 102 (3rd Cir. 1975) (*Lindy II*).

### 1. *The Lodestar Award.*

*Lindy II* provided some guidance to district courts in the application of the principles set forth in *Lindy I*:

"We find it necessary also to observe that we did not and do not intend that a district court, in setting an attorneys' fee, become enmeshed in a meticulous analysis of every detailed facet of the professional representation. It was not and is not our intention that the inquiry into the adequacy of the fee assume massive proportions, perhaps even dwarfing the case in chief. Once the district court determines the reasonable hourly rates to be applied, for example, it need not conduct a minute evaluation of each phase or category of counsel's work. In *Lindy I* we said: 'Any increase or decrease in fees to adjust for the quality of work is designed to take account of an unusual degree of skill, be it unusually poor or unusually good. If the district judge determines that particular work was of a typical quality, he should, in increasing or decreasing the fee, be cognizant of the amount of time devoted to that *given activity*.' 487 F.2d 168–69 (emphasis added). The italicized words were not intended to carry the implication that, in assaying the quality of work that might affect the lodestar award, the district court should inquire separately into the components of the legal representation, to-wit, pleadings, discovery, court appearances, etc. Rather, we meant only that consideration of the quality factor should relate to the over-all conduct of the specific case before the court, to-wit, 'that particular work,' 'that given activity' for which the fee is awarded." 540 F.2d at 116–117.

With this caveat in mind, an analysis of the fee petition may be undertaken. Set forth below is a breakdown of the hours expended by counsel and their hourly rates for prosecuting the litigation as of March 1, 1979.

| ATTORNEYS | REASONABLE HOURLY RATES | HOURS SPENT PROSECUTING LITIGATION | LODESTAR FIGURE | FEES REQUESTED FOR PROSECUTING LITIGATION (HOURLY RATES X HOURS X 1.80) |
|---|---|---|---|---|
| L. BARRACK | $125 | 1,730.75 | $216,343.75 | $389,418.75 |
| G. RODOS | 85 | 1,596.25 | 135,681.25 | 244,226.25 |
| P. McMAHON | 80 | 2,215.25 | 177,220.00 | 318,996.00 |
| D. BACINE | 75 | 408.50 | 30,637.50 | 55,147.50 |
| H. NEWBERG | 150 | 5.50 | 825.00 | 1,485.00 |
| J. GREENE, JR. | 100 | 81.50 | 8,150.00 | 14,670.00 |
| R. GREENFIELD | 125 | 101.75 | 12,718.75 | 22,893.75 |
| R. FRUTKIN | 75 | 30.50 | 2,287.50 | 4,117.50 |
| P. FUOCO | 75 | 5.00 | 375.00 | 675.00 |
| CLERKS AND PARALEGALS | 10 | 209.00 | 2,090.00 | 3,762.00 |
| TOTALS | | 6,384.25 | $586,328.75 | $1,055,391.75 |

Also incorporated in the fee petition is a breakdown of the hours expended and the hourly rates for settlement administration set forth in the table reproduced below. This table also incorporates the total hours expended in the entire litigation, the lodestar figure for litigation and settlement administration, and a total fee sought for litigation and settlement administration.

| ATTORNEYS | REASONABLE HOURLY RATES | HOURS SPENT ON SETTLEMENT ADMINIS-TRATION THROUGH MARCH 1, 1979 | HOURS ESTIMATED TO BE SPENT ON SETTLE-MENT ADMIN-ISTRATION | LODESTAR FIGURE FOR SETTLEMENT ADMINISTRATION | TOTAL FEES REQUESTED (PROSECUTION AND SETTLEMENT ADMINISTRATION) |
|---|---|---|---|---|---|
| L. BARRACK | $125 | 33.0 | 125 | $ 19,750.00 | $ 409,168.75 |
| G. RODOS | 85 | 50.5 | 125 | 14,917.50 | 259,143.75 |
| P. McMAHON | 80 | 8.0 | 100 | 8,640.00 | 327,636.00 |
| D. BACINE | 75 | – | 50 | 3,750.00 | 58,897.50 |
| H. NEWBERG | 150 | – | – | – | 1,485.00 |
| J. GREENE, JR. | 100 | – | 10 | 1,000.00 | 15,670.00 |
| R. GREENFIELD | 125 | – | – | – | 22,893.75 |
| R. FRUTKIN | 75 | – | – | – | 4,117.50 |
| P. FUOCO | 75 | – | – | – | 675.00 |
| CLERKS AND PARALEGALS | 10 | – | – | – | 3,762.00 |
| TOTALS FOR SETTLEMENT ADMINISTRATION | | 91.5 | 410 | $ 48,057.50 | |
| TOTALS FOR ENTIRE LITIGATION | | | 6,885.50 | $634,386.25 | $1,103,449.25 |
| MULTIPLE OF REQUEST OVER LODESTAR | | | | 1.74 | |

Both tables set forth the hourly rates sought by counsel.

a. *Description of Petitioners.*

Plaintiff's lead counsel in this case, the firm of Barrack, Rodos & McMahon was formed in 1976 by Leonard Barrack, Gerald J. Rodos and Paul J. McMahon. Sometime thereafter, Daniel E. Bacine joined the firm. In 1978, Herbert B. Newberg became counsel to the firm. Formerly, Messrs. Barrack, Rodos and McMahon had been associated with the law firm of David Berger, P.A., now Berger and Montaque, located in Philadelphia, Pennsylvania. Prior to joining the firm of David Berger, Mr. Barrack had been associated with the Philadelphia law firm of Dilworth, Paxson, Kalish, Levy & Kauffman. While associated with the firm of David Berger, P.A., Messrs. Barrack, Rodos and McMahon were each involved in complex multidistrict class action litigation in the anti-trust as well as the securities area of the law. Mr. Barrack was chairman of the securities litigation department at David Berger, P.A. from 1971 until he left that firm in 1976. Since the formation of Barrack, Rodos & McMahon, that firm has been busily engaged in complex class action litigation. The hourly rates sought in the fee petition $125/hour (Mr. Barrack), $85/hour (Mr. Rodos), and $80/hour (Mr. McMahon) are reasonable in light of their academic credentials and extensive experience in this area of the law. Indeed, plaintiff's expert, Mr. Weiss, testified that the hourly rates sought by these attorneys were somewhat low. (N.T. at 33–34).

Herbert B. Newberg, counsel to the firm of Barrack, Rodos & McMahon, is a 1961

graduate of the Harvard Law School. Mr. Newberg is author of a six volume treatise entitled *Newberg On Class Action: A Manual For Group Litigation At Federal And State Levels.* Mr. Newberg's hourly rate of $150/hour is also reasonable in light of his experience and background.

The firm of Greenfield & Schoen is a professional corporation which employs four attorneys and two paralegals. It specializes in securities litigation. Richard D. Greenfield, senior member of the firm, is a 1965 graduate of the Cornell Law School. He has wide experience in securities litigation involving shareholder derivative and class actions. His hourly rate of $125/hour is also reasonable in light of his experience and background.

As to the hourly rates sought on behalf of Messrs. Bacine, Greene, Frutkin and Fuoco, I am satisfied that the hourly rates set forth above are reasonable. In passing, the following passage from *Lindy I* on the question of the value of a lawyer's services is instructive:

> "Courts have noted that expert testimony is not necessary to establish the value of a lawyer's services and have, on that ground, sanctioned the award of attorneys' fees on the basis of affidavits without a hearing. (Citation omitted). A judge is presumed knowledgeable as to the fees charged by attorneys in general and as to the quality of legal work presented to him by particular attorneys; these presumptions obviate the need for expert testimony such as might establish the value of services rendered by doctors or engineers." 487 F.2d at 169.

Defense counsel have not contested the reasonableness of the hourly rates sought by plaintiff's counsel, nor have any of the members of the class objected to the amount of counsel fees sought by petitioners. Incidentally, I am also satisfied that the hourly rate of $10 per hour sought for the efforts expended by clerks and paralegals in this litigation is also reasonable.

The total number of hours spent in prosecuting the litigation, including 209 hours spent by clerks and paralegals, is 6,384.25 hours. The conduct of this litigation has involved the exchange of several sets of voluminous interrogatories, the examination of several hundred thousand documents, the deposition of twenty-two individuals and the filing and arguing of several difficult motions. In light of all that has been done and all that has been accomplished within a relatively brief period of time, the total number of hours spent prosecuting this litigation is reasonable and I accept it as valid for the lodestar computation. The lodestar figure for all hours expended in prosecuting the litigation comes to $586,328.75.

In addition, counsel for plaintiff seeks to be compensated for an additional 410 hours to be expended in settlement administration. Given the complexity of administering this settlement, the figure of 410 hours is certainly reasonable. Applying the reasonable hourly rates of counsel indicated above to that figure, the lodestar figure for settlement administration comes to $48,057.50. Combining these two lodestar computations, the lodestar figure for both litigation and settlement administration comes to $634,386.25 for 6,885.50 hours of work.

### 2. *The Contingent Nature of Success.*

Whether, and under what circumstances, the lodestar figure should be increased or decreased was an issue addressed by the Third Circuit in *Lindy II*. The court noted:

> "Under the rubric of 'the contingent nature of success' the district court should appraise the professional burden undertaken—that is, the probability or likelihood of success, viewed at the time of filing suit. The court may increase the amount established in the computation of the 'lodestar' as a reasonable fee on the basis of a careful evaluation of the following factors:

1. Analysis of plaintiff's burden. Subsumed in this category are the following considerations: (a) the complexity of the case,—legally and factually; (b) the probability of defendant's liability,—whether it is clear or dubious; whether it has been previously suggested by other civil or criminal proceedings; whether it is asserted under existing case law or statutory interpretation, or is advanced as a novel theory; (c) an evaluation of damages,—whether the claims would be difficult or easy to prove.

2. Risks assumed in developing the case. This category subsumes consideration of: (a) the number of hours of labor risked without guarantee or remuneration; (b) the amount of out-of-pocket expenses advanced for processing motions, taking depositions, etc.; (c) the development of prior expertise in the particular type of litigation; recognizing that counsel sometimes develop, without compensation, special legal skills which may assist the court in efficient conduct of the litigation, or which may aid the court in articulating legal precepts and implementing sound public policy.

3. The delay in receipt of payment for services rendered." 540 F.2d at 117.

a. *Analysis of Plaintiff's Burden.*

As indicated earlier, plaintiff would have encountered several formidable difficulties had this case proceeded to trial. Proving *scienter,* out-of-pocket loss, and proximate cause would have been difficult. This action was not preceded by any prior governmental investigation or proceeding. Indeed, throughout the three year period in which this matter has been pending, no governmental civil or criminal investigation or proceeding has ever been initiated. The absence of any governmental activity is a factor which courts have deemed important in awarding counsel fees in excess of the lodestar. *See Arenson v. Board of Trade of the City of Chicago,* 372 F.Supp. 1349 (N.D. Ill.1974).

b. *Risks Assumed in Developing The Case.*

The risks assumed by plaintiff's counsel in undertaking his litigation were very great indeed. The testimony of plaintiff's expert witness, Mr. Weiss, was instructive on this point. In response to a question soliciting his opinion of the nature of the risk undertaken by lawyers who accept cases of this type, he indicated:

"The risk is very, very high. It is so high that very few established—what I would call establishment law firms will accept actions such as this on a contingent basis, and I have inquired over the years as to whether or not the larger firms would accept these cases and almost invariably no, (sic) they wouldn't on a contingent basis.

\* \* \* \* \* \*

The investment in a case like this is enormous for most firms practicing in the field. Why is it enormous? It's enormous because not only do you have to lay out out-of-pocket expenses, but you also have to feed an overhead without being compensated for the time being spent so that you can pay your bills on a current basis. In a regular type of a law firm, if a client walks in the door to retain you, you're pretty happy about that because you know if you can perform your services over the next month or two, you can be able to send out a bill and pay your own bills with the proceeds of that invoice. Well, a contingent stockholder lawyer confronted with a new client, has to look at it in the following way. Should I undertake this enormous burden for three to six or eight years without getting paid? There are other ways that he could spend his time—he could spend his time, where he can get paid on a current basis to pay overhead, to pay personal expenses and to invest the monies as the monies are produced. But in this kind of a case, you're making a long term commitment in a high risk situation without any assurance of recovery. I

consider this a very high risk and a very difficult type of case to accept in the first instance." (N.T. at 34–37).

In *Lindy I*, the Third Circuit acknowledged this factor by citing Judge Wyzanski's Opinion in *Cherner v. Transitron Electronic Corp.*, 221 F.Supp. 55, 61 (D.Mass.1963):

"No one expects a lawyer to give his services at bargain rates in a civil matter on behalf of a client who is not impecunious. No one expects a lawyer whose compensation is contingent upon his success to charge, when successful, as little as he would charge a client who in advance had agreed to pay for his services, regardless of success. Nor, particularly in complicated cases producing large recoveries, is it just to make a fee depend solely on the reasonable amount of time expended." 487 F.2d at 168.

Here, counsel for plaintiff has risked 6,475.75 hours without any guarantee of success. In addition, plaintiff's counsel incurred approximately $26,000.00 in out-of-pocket expenses which had to be advanced during the pendency of this action.

It is also clear that but for the expertise which plaintiff's counsel had developed in prior litigation of this type, many more hours would have been expended in prosecuting this case. One notable example is that the class certification question was resolved by stipulation and order, rather than in a series of protracted and hotly contested motions. It is ironic that less experienced counsel would have spent more time in discovery and in litigating the question of class certification, thereby elevating the lodestar figure. Certainly, it would be unfair to penalize plaintiff's counsel for reducing the number of hours actually spent in preparing this matter for trial. In addition, the skill and expertise of all counsel in this case reduced the amount of time which the court was required to expend in resolving pre-trial discovery disputes.

c. *The Delay in Receipt of Payment for Services Rendered.*

More than three years have passed since plaintiff's counsel first began investigating this matter in March, 1976. During that entire period, plaintiff's counsel has not been compensated in any way for the services rendered in the prosecution of this law suit. As noted in *Lindy II*, such a delay in payment for services rendered is a factor to be considered in analyzing "the contingent nature of success." Not only have counsel for plaintiff allocated 6,475.75 hours of their time to this law suit, they have also allocated a significant portion of their office overhead to this matter. In addition, this court cannot ignore recent inflationary trends in the economy of the United States which have resulted in a significant erosion of the real value of the American dollar over the past three years.

3. *The Quality of the Work Performed.*

In *Lindy II* the Third Circuit indicated:

"In determining whether to adjust the 'lodestar' for quality work or not, the district court may consider, *inter alia*:

1. The result obtained by verdict or settlement, evaluated in terms of (a) the potential money damages available to the class member, i. e., a comparison of the extent of possible recovery with the amount of actual verdict or settlement; (b) the benefit—monetary or non-monetary—conferred on the class, i. e., permitting the court 'to recognize and reward achievements of a particularly resourceful attorney who secures a substantial benefit for his clients with a minimum of time invested. . . .'" *Merola II* [*v. Atlantic Richfield Co.* (3 Cir. 1975)], *supra*, 515 F.2d [165] at 168.

2. An evaluation of the professional methods utilized in processing the case,—rewarding the use of efficient methods to expedite the case and penalizing the use of methods the predominant purpose of which was to delay or obstruct proceedings." *Lindy II*, 540 F.2d at 118.

a. *The Results Obtained and the Benefit Conferred Upon the Class.*

The settlement obtained on behalf of the class in this case is extraordinary in at least

two ways. First, the settlement fund of $4,400,000 was actually paid by defendants at the time of the execution of the settlement agreement, and invested in interest-bearing obligations so that the class would receive the benefit of accrued interest while the matter was pending a final determination by the court. Accordingly, all of the settlement funds were deposited in interest-bearing accounts on November 24, 1978. As of May 31, 1979 approximately $255,000 of interest had accrued to the benefit of the class. By the time the settlement funds are actually disbursed, the total settlement figure will approach $5,000,000.

In addition, counsel for plaintiff were able to obtain a separate administration fund of $175,000 to cover the cost of administering the settlement. This also represents a significant savings to the class, particularly since the notice procedures directed by the court resulted in an expenditure of approximately $100,000.

As noted earlier in this court's discussion of the problems plaintiff might encounter in proving *scienter*, out-of-pocket loss, and proximate cause, had this matter proceeded to trial, plaintiff might well have received a verdict significantly less than $5,000,000, and possibly no verdict at all. In addition, trial costs could easily have amounted to $300,000.

b. *Evaluation of the Professional Methods Utilized in Processing the Case.*

This court has had an opportunity to observe the performance of counsel during several pre-trial conferences, and has reviewed virtually all of the papers filed by counsel. The skill and expertise of plaintiff's counsel resulted in a tremendous savings of court time. In a case of this magnitude, it is unusual for discovery to proceed as quickly as it did. The only discovery dispute that the court was called upon to resolve involved the entry of the document preservation order. No other discovery motions were filed by any party in this law suit. The question of class certification was resolved by stipulation and order. It is fair to say that defendants in this matter were represented by the finest counsel in the State of New Jersey. Dickinson R. Debevoise, Esquire, of the firm of Riker, Danzig, Scherer, Debevoise & Hyland, who appeared on behalf of The Singer Company, and William D. Hardin, Jr., Esquire, of the firm of Pitney, Hardin & Kipp, who represented the individual defendants, are extraordinarily able and experienced counsel. Defendants presented a spirited, vigorous and skillful defense.

4. *Adjusting the Lodestar.*

Based upon the foregoing analysis, it is clear that the quality of performance of plaintiff's counsel has been exceptionally high. It is also equally clear that this case involved tremendous risks for plaintiff's counsel. Under the standards announced in *Lindy I* and *Lindy II*, an upward adjustment of the lodestar is clearly warranted. Plaintiff's counsel have not sought any upward adjustment of the lodestar for the 410 hours to be spent in settlement administration. Accordingly, there is no need to determine whether any such adjustment should be made with respect to hours spent in settlement administration. Plaintiff's counsel seeks a multiple of 1.8 for the 6,384.25 hours expended in prosecution of the litigation, or a total fee of $1,055,391.75. To that figure, plaintiff's counsel seeks an additional $48,057.50 for time expended in settlement administration. Adding the two figures together, petitioners seek a total fee of $1,103,449.25. This total fee represents a multiple of 1.74 above the lodestar determination. If approved, the fee sought by petitioners would amount to slightly in excess of 20% of the total settlement fund available for distribution once all accrued interest had been added on. Traditionally, fees in the range of 20% to 30% of the recovery obtained on behalf of the class are not unusual. *See Rosenfeld v. Black*, 56 F.R.D. 604, 605–606 (S.D.N.Y.1972). Plaintiff's expert, Mr. Weiss, analyzed the fee sought, and concluded that based upon his extensive experience in this area, it was a reasonable fee. (N.T. at 37–42).

At the hearing to approve the settlement, counsel for defendants indicated that they

could not take exception to the fee application. (N.T. at 43–44).

### III. CONCLUSION

After reviewing the petition for counsel fees in light of *Lindy I* and *Lindy II*, I am satisfied that a fee of $1,103,449.25 is warranted in this case. Counsel for plaintiff have labored long and hard in an effort unaided by any prior governmental action. They have obtained an excellent result notwithstanding serious difficulties regarding liability and damages. They assumed great risks in undertaking this litigation, and have performed with skill and diligence. As one who has observed this litigation since the filing of the complaint, I can say that they have achieved a remarkable result. For the foregoing reasons, I respectfully recommend that the petition for counsel fees in the amount of $1,103,449.25 be approved. In addition, petitioners seek to recover $26,087.90 as reimbursement for out-of-pocket costs advanced during the course of this litigation. That amount includes expenses incurred as of March 15, 1979. I have reviewed those expenses, and find them to be reasonable. Accordingly, I recommend that the request for out-of-pocket costs in the amount of $26,087.90 be approved in addition to the counsel fee discussed above. Petitioners are also granted leave to file a supplemental request for any out-of-pocket costs incurred after March 15, 1979.

### ORDER

BROTMAN, District Judge.

The Honorable Stephen M. Orlofsky, United States Magistrate, having filed a Report and Recommendation dated August 10, 1979 approving the Stipulation and Agreement of Compromise and Settlement in this class action and further granting counsel for the plaintiff class fees in the amount of $1,103,449.25; and

No objections having been filed by either party within ten (10) days as required by Local Rule 40(A)(10)(a) and 28 U.S.C. § 636(b)(1); and

The court having carefully reviewed the Report and Recommendation and concurring therewith,

It is on this 21st day of August, 1979 ORDERED that the Report and Recommendation of Stephen M. Orlofsky, United States Magistrate, a copy of which is attached hereto, is adopted as the opinion of the court.

It is further ORDERED that:

1. The Stipulation and Agreement of Compromise and Settlement between the parties to this class action is approved; and

2. Counsel fees are awarded in the following amounts:

| | |
|---|---|
| L. BARRACK | $409,168.75 |
| G. RODOS | 259,143.75 |
| P. McMAHON | 327,636.00 |
| D. BACINE | 58,897.50 |
| H. NEWBERG | 1,485.00 |
| J. GREENE, JR. | 15,670.00 |
| R. GREENFIELD | 22,893.75 |
| R. FRUTKIN | 4,117.50 |
| P. FUOCO | 675.00 |
| CLERKS AND PARALEGALS | 3,762.00 |

3. Disbursements are awarded in the amount of $26,087.90.