**Abner HARKAVY, Plaintiff-Appellant,**

v.

**APPAREL INDUSTRIES, INC. and S. M. Elowsky, Defendants-Appellees.**

**No. 141, Docket 77–7169.**

United States Court of Appeals, Second Circuit.

Argued Oct. 3, 1977.

Decided Feb. 6, 1978.

Osmond K. Fraenkel, New York City (David Brown, Austrian, Lance & Stewart, New York City, of counsel), for plaintiff-appellant.

Donald L. Kuba, New York City (Charles L. Sylvester, Warshaw, Sylvester, Burnstein & Franks, New York City, of counsel), for defendants-appellees.

Before HAYS, GURFEIN and MESKILL, Circuit Judges.

MESKILL, Circuit Judge:

This is an appeal from a judgment entered in the United States District Court for the Southern District of New York, Dudley B. Bonsal, Judge, dismissing after a two-day bench trial appellant Abner Harka-

vy's complaint that Apparel Industries, Inc. ("Apparel") and S. M. Elowsky, Apparel's founder, chief executive officer, director and controlling stockholder, violated § 10(b) of the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),[1] and Securities and Exchange Commission Rule 10b–5, 17 C.F.R. § 240.10b–5,[2] by failing to disclose material information on two occasions when Harkavy redeemed his Apparel stock. Federal jurisdiction is based on § 27 of the Securities Exchange Act of 1934, 15 U.S.C. § 78aa, and 28 U.S.C. §§ 1331, 1332. The district court held that Harkavy failed to sustain his burden of proof. We affirm that judgment.

Apparel is a New York corporation that designs, manufactures and markets women's sportswear and knitwear. S. M. Elowsky is its founder and, until 1970, was its controlling stockholder; he has served as chief executive officer of the corporation and is now chairman of the board. Appellant Harkavy, a former Apparel stockholder, was employed by Elowsky for approximately 35 years. Beginning in 1945 he worked for Kordeen Manufacturing Co., one of Elowsky's sportswear and knitwear companies; in 1961 he was appointed vice-president and plant manager. He was then the owner of 306 shares of Kordeen stock. In August, 1961, Kordeen shareholders entered into a plan of reorganization with Apparel under which Kordeen stock was exchanged for Apparel stock on an 11-to-1 basis. Harkavy ended up with 3,366 shares of Apparel. Harkavy's employment relationship with Elowsky ended in 1968, at which time he began his own sportswear and knitwear business in Herkimer, New York.

On March 10, 1969, Apparel purchased the business of House of Morrison Knitwear, Inc. ("Morrison") through an exchange of stock. At the same time, Apparel, Elowsky and the former Morrison stockholders entered into a shareholders' agreement which gave to Apparel the right of first refusal on the Apparel stock owned by the former Morrison stockholders. The agreement also granted Elowsky the right to sell 20,000 of his Apparel shares to third parties until January 1, 1970, a right which he did not exercise, and the right to require Apparel to repurchase his stock at book value after April 1, 1970.

On March 15, 1969, Harkavy visited Elowsky and indicated that he was thinking about selling his Apparel stock, apparently because his own company was in need of funds[3] and because he was losing faith in Elowsky's ability to manage the company. Elowsky confirmed to Harkavy that Appar-

---

1. The statute reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(a) To effect a short sale, or to use or employ any stop-loss order in connection with the purchase or sale, of any security registered on a national securities exchange, in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

2. The rule reads as follows:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interestate [sic] commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

3. Harkavy's company went out of business in 1971.

el was indeed losing money[4] and that it was acquiring the Morrison business. Harkavy was not told the details of the shareholders' agreement. After some discussion, Elowsky suggested that Apparel could repurchase Harkavy's stock but urged him to defer such a sale until the Morrison transaction was finalized. Elowsky believed that Harkavy's stock would sell for a higher price at that time. Harkavy, however, elected to sell 366 of his shares immediately for the then book value of $4.00 per share. He deferred the sale of his remaining 3,000 shares until January 15, 1970, when he received the higher book value price of $4.43.

Between the 1969 and 1970 sales, *Women's Wear Daily* published an article about Apparel's acquisition of Morrison. The article indicated that Apparel was considering entering the junior wear manufacturing and marketing business. Specifically, the article said that Max Jaffe, a principal of Morrison, and Elowsky were "working on plans" to begin a junior wear line, that it would begin in the "not too distant future" and that such an operation was something Elowsky had "wanted for a long time." Harkavy was unaware of this article until sometime in 1975. In the spring of 1970, Apparel hired a Mr. Daniel Grey and an assistant, Mr. Seymour Bag, to plan, design and help market a new line of merchandise. The first samples of this new line were cut in June and July of 1970, and production began at the end of August, 1970, under the name of "Trousers Up."

Also between Harkavy's 1969 and 1970 sales, Apparel repurchased 41,500 shares of Apparel from Hannah Rosen Tannenbaum, one of the signatories to the March 10, 1969, agreement. Her stock was purchased for $4.43, the same price that Harkavy received for his stock in January, 1970. Apparel also repurchased 15,000 shares from Anna Reiss, Elowsky's sister, at a price of $4.00 per share. Harkavy was informed of the latter

transaction, but not the former, prior to his January sale.

## DISCUSSION.

Harkavy attempted to prove at trial that Apparel and Elowsky knew about but failed to disclose major changes in the corporation, changes that, had he known of them, would have prompted him to hold on to his stock. He argues that he should have been told (1) that Apparel had plans to introduce a new line of sportswear and knitwear, plans evidenced primarily by the *Women's Wear Daily* article and the subsequent hiring of Grey and Bag; (2) that Apparel had entered into repurchase agreements with various stockholders and had actually made some such repurchases, transactions he alleges would have increased the value of his holdings in Apparel had he not been "induced" to sell; and (3) in effect, that Apparel was on the verge of making a substantial turnaround in its financial condition. He seeks damages amounting to the difference between the sale price and the highest fair market value of Apparel stock since the dates of his sales, adjusted to reflect a 9:1 stock split in 1972. We affirm the judgment of the district court.

The essential question here, of course, is whether Harkavy sustained his burden of proving that Apparel and Elowsky failed to disclose to him "material" information known at the time of the two stock transactions. *See SEC v. Texas Gulf Sulphur Co.*, 401 F.2d 833, 848–49 (2d Cir. 1968) (en banc), *cert. denied*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). The Supreme Court has explained that:

The issue of materiality may be characterized as a mixed question of law and fact, involving as it does the application of a legal standard to a particular set of facts. . . . [T]he underlying objective facts, which will often be free from

---

4. The record shows that Apparel lost $101,733 in 1968 and $234,458 in 1969. Business eventually improved for Apparel, however; it showed a profit of $255,699 for 1970, $465,028 for 1971, and $704,189 for the first eight months of 1972. In late 1972 Apparel filed a

registration statement and preliminary prospectus with the Securities and Exchange Commission. The registration statement was withdrawn voluntarily, however, in late 1973 due to adverse market conditions.

dispute, are merely the starting point for the ultimate determination of materiality. The determination requires delicate assessments of the inferences a "reasonable shareholder" would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.

*TSC Industries, Inc. v. Northway, Inc.*, 426 U.S. 438, 450, 96 S.Ct. 2126, 2133, 48 L.Ed.2d 757 (1976) (footnotes omitted). In order to establish materiality, there must be "a showing of a substantial likelihood that, under all the circumstances, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder," or, putting it another way, "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *Id.* at 449, 96 S.Ct. at 2133 (footnote omitted).[5] Of particular importance to this dispute is the rule concerning present facts which signal or influence the future patterns of a corporation:

> [M]aterial facts include not only information disclosing the earnings and distributions of a company but also those facts which affect the probable future of the company and those which may affect the desire of investors to buy, sell, or hold the company's securities.
>
> In each case, then, whether facts are material within Rule 10b–5 when the facts relate to a particular event and are undisclosed by those persons who are knowledgeable thereof will depend at any given time upon a balancing of both the indicated probability that the event will occur and the anticipated magnitude of the event in light of the totality of the company activity.

*SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 849. In addition, although definite plans of future corporate activity may at times be viewed as material facts,

Section 10(b) does not require that an insider "confer upon outside investors the benefit of his superior financial or other expert analysis by disclosing his educated guesses or predictions." . . . In short, the law mandates disclosure only of existing material facts. It does not require an insider to volunteer any economic forecast.

*Arber v. Essex Wire Corp.*, 490 F.2d 414, 421 (6th Cir.), *cert. denied,* 419 U.S. 830, 95 S.Ct. 53, 42 L.Ed.2d 56 (1974), *quoting SEC v. Texas Gulf Sulphur Co., supra,* 401 F.2d at 848. Finally, a plaintiff in a Rule 10b–5 non-disclosure action must show more than mere negligence. "Scienter"—intent to deceive, manipulate or defraud—must be shown. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976); *see SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 14 (2d Cir. 1977).

■ Applying these principles to the facts of this case, we think it is apparent that Harkavy failed to show a material non-disclosure and scienter. The district court determined that Apparel had no plans to market a junior wear line before the middle of 1970, no doubt relying on the testimony of Elowsky and Jaffe that in November, 1969, the time of the *Women's Wear Daily* article, Apparel's "plans" were "just talk." The court also determined that Apparel did not begin to promote a new junior wear line until well into 1970, when Grey was hired. We cannot characterize this finding as clearly erroneous. *See* Fed. R.Civ.P. 52(a); *Barnett v. Kirshner*, 527 F.2d 781, 784–85 (2d Cir. 1975). To the minimal extent that such plans could be said to have existed, we do not believe Harkavy was entitled to a more thorough disclosure than was included in the *Women's Wear Daily* article—a press release in a trade journal devoted specifically to his general line of business. The "indicated probability" that the "plans" would be acted upon was slight, and the "anticipated magnitude of the event in light of the total-

---

5. This is not only the standard for proxy-related disputes, but for Rule 10b–5 disputes as well. *See Goldberg v. Meridor*, 567 F.2d 209, 218–19 (2d Cir. 1977) (Friendly, *J.*); *SEC v. Bausch & Lomb Inc.*, 565 F.2d 8, 14–15 (2d Cir. 1977) (Kaufman, *C.J.*).

ity of the company activity" was, at best, speculative. *SEC v. Texas Gulf Sulphur Co., supra*, 401 F.2d at 849. Apparel quite understandably hoped that a new line of merchandise would turn its financial fortunes around, but, given the erratic nature of the industry, it could in no way count on such a turnaround actually taking place.

It was undisputed that Elowsky never exercised his right to sell 20,000 shares of Apparel to third parties and that, in December 1969 and January 1970, Apparel repurchased Apparel stock from signatories to the shareholders' agreement for the agreed upon book value, the same price that was paid to Harkavy for his stock in January. Harkavy's apparent theory was that these purchases were indicative of a conspiracy by Elowsky and Apparel to coax minority stockholders into selling their stock back to Apparel. The court found, however, that Harkavy sold his stock voluntarily. Harkavy and Elowsky were relatives and had been business associates for 35 years. Harkavy was thoroughly familiar with the knitwear and sportswear industry, and when he consulted with Elowsky about selling his stock he was advised to defer the sale. There was evidence that he disregarded this advice because he needed the funds. In view of this, we cannot characterize the findings by the district court as clearly erroneous.

Finally, there was no evidence whatsoever that Apparel's repurchase of stock from the various stockholders either did or could increase the value of Harkavy's holdings. Nor was there evidence tending to show that Elowsky or Apparel had the "scienter" required for a successful Rule 10b–5 action.

Harkavy did not prove that there had been a material non-disclosure under Rule 10b–5. The judgment of the district court is affirmed.