Moses JAROSLAWICZ, Individually and on Behalf of All Others Similarly Situated, Plaintiff,

v.

ENGELHARD CORPORATION, et al., Defendants.

Civ. No. 84–3641 (CSF).

United States District Court, D. New Jersey.

Jan. 30, 1989.

ben F. Richards, R. Keith Elliot, Orin R. Smith, S.N. Roseberry, Jr. and Carl E. Peterson.

## AMENDED OPINION

CLARKSON S. FISHER, District Judge.

Defendants were or are closely involved with Engelhard Corporation ("Engelhard"),[1] a concern engaged in a multitude of manufacturing activities which include the refining of gold, silver and platinum from both raw ore and metal scrap. On April 5, 1984, Engelhard publicly recognized a loss of roughly thirty-five million dollars at its metal refining facilities in Newark, New Jersey, and at Sheffield in the United Kingdom. Thereafter the value of Engelhard stock dropped appreciably and diminished the value of shares owned by plaintiff, Moses Jaroslawicz. Shortly thereafter, plaintiffs instituted this class action suit, alleging that Engelhard violated federal securities laws. Now, after over four years of discovery and preliminary motions, Engelhard has moved the court for summary judgment.[2]

Before turning to the merits of Engelhard's motion, the court must first address certain procedural matters which bear upon the scope of its opinion. The parties agree that Jaroslawicz's twenty-one-page complaint alleges that Engelhard concealed a prior decision to write down the Newark and Sheffield facilities in order to avoid a devaluation of its stock. Defendants, however, object to Jaroslawicz's assertion that the document also sets forth a claim for failure to disclose material information regarding the operation and profitability of the two plants.[3] Engelhard cites

Gladstone & Hart by Marvin H. Gladstone, Hackensack, N.J., Barrack, Rodos & Bacine by Leonard Barrack, Sheldon L. Albert, Samuel R. Simon, Levin, Fishbein, Sedran & Berman, by Howard J. Sedran, Arnold Levin, Philadelphia, Pa., for plaintiff.

Connell, Foley & Geiser by Richard D. Catenacci, Liza Walsh, Roseland, N.J., Cahill, Gordon & Reindel by Raymond L. Falls, Jr., Howard G. Sloane, Anthony Paduano, New York City, for defendants Engelhard Corp., Irving Isko, Milton F. Rosenthal, Nelson B. Colton, Frederick H. Cook, Cyrus H. Holley, Carl D. Keith, Reu-

1. Because this class action centers around the behavior of Engelhard Corporation, its directors and officers, the court will refer to all defendants as "Engelhard."

2. As a result of this discovery the parties have presented the court with a lengthy and complex factual record. Rather than repeat itself, the court will set forth additional facts as they become relevant to its opinion.

3. In a footnote to his memorandum in opposition, plaintiff has informed the court of his

decision "not to pursue" a claim that reports of the Newark and Sheffield facilities' profits failed to disclose those profits' derivation from sales of the two plants' inventory. *See* Plaintiff's Memorandum in Opposition, p. 2 n. 1. Defendant appears to be in agreement with this decision. *See* Defendant's Reply Memorandum, p. 3.

No motion has been placed before the court concerning this matter. Given both parties' agreement, the court will construe these statements as a motion to amend under Rule 15(a), and will grant the motion.

the court's opinion of February 25, 1985, for the proposition that plaintiff's second theory is a new cause of action.[4] Defendants contend that "[i]t is too late in the game" for plaintiffs to be allowed to amend their complaint. Defendants' Reply Memorandum, p. 4.

The court's February 1985 opinion addressed a previous motion for summary judgment and therefore discussed only those theories which were the subject of the motion. Indeed, the court has consistently referred to plaintiff's second theory in its prior opinions. One year after its February opinion, the court described plaintiff's claim thus:

> Plaintiff's complaint alleges that defendants artificially inflated the market value of their stock by misrepresenting certain facts and failing to disclose certain facts pertaining to financial worth, earnings and prospects. Plaintiff also alleges fraud and misrepresentation.

Opinion of June 19, 1986 at p. 2 [1986 WL 7044]. The court's interpretation is consistent with the complaint. At paragraph twenty-five of the complaint, plaintiff alleges:

> Defendants employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of conduct ... which included the making of untrue statements of material facts, omitting to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading....

Plaintiff's Complaint, Paragraph 35. *See also* paragraphs 47–48, 52(d)–(f), 52(h). In sum, plaintiff's claim for "material omission" is properly before the court. Therefore, the court turns to the merits of Engelhard's motion, bearing in mind that any "inferences to be drawn from the underlying facts ... must be viewed in the light most favorable to" Jaroslawicz. *United States v. Diebold, Inc.*, 369 U.S. 654, 655, 82 S.Ct. 993, 994, 8 L.Ed.2d 176 (1962).

Section 10(b) of the Securities Exchange Act of 1934, and its enabling counterpart, Rule 10b–5[5] impose liability for failure to disclose material facts which pertain to the value of corporate securities.[6] A "material fact" is one which would, if disclosed under the circumstances of the relevant transaction, have had a substantial likelihood of affecting a reasonable shareholder's deliberations concerning the transaction. *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976). There need not be positive proof of reliance; all that is required is a showing that material facts were not disclosed. *Id.* at 447 n. 9, 96 S.Ct. at 2132 n. 9.

It should be noted that summary judgment on the issue of materiality is generally considered inappropriate. No less an authority than the Supreme Court has said that:

> The issue of materiality may be characterized as a mixed question of law and fact.... The determination requires delicate assessments of the inferences a 'reasonable shareholder' would draw from a given set of facts and the significance of those inferences to him, and these assessments are peculiarly ones for the trier of fact.[7]

---

4. In that opinion the court said: "Plaintiff's complaint is premised on two nondisclosures or material omissions. First, ... that a substantial portion of the company's earnings was the result of a sale of inventory.... Second, that Engelhard purposely delayed in announcing that it was closing two refining facilities so that earnings would be overstated...." Opinion of February 25, 1985, pp. 2–3.

5. Found at 17 C.F.R. section 240.10b–5.

6. "The Court has said that the 1934 Act and its companion legislative enactments embrace a 'fundamental purpose ... to substitute a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics in the securities industry." *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (1972) (*quoting S.E.C. v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)).

7. The *Northway* court also stated that "[i]n an analogous context, the jury's unique competence in applying the 'reasonable man' standard is thought ordinarily to preclude summary judgment in negligence cases." *Northway*, 426 U.S. at 450 n. 12, 96 S.Ct. at 2133 n. 12.

*Id.*, 426 U.S. at 450, 96 S.Ct. at 2132–33 (citations omitted); *and see Rogen v. Ilikon Corp.*, 361 F.2d 260, 265–66 (1st Cir. 1966); *Harkavy v. Apparel Indus., Inc.*, 571 F.2d 737, 741 (2d Cir.1978); *Fisher v. Plessey Co. Ltd.*, 559 F.Supp. 442, 448 (S.D. N.Y.1983); *In re Washington Public Power Supply System*, 650 F.Supp. 1346, 1351 (W.D.Wash.1986). Summary judgment on the issue of materiality is appropriate only if Engelhard demonstrates that reasonable minds could not consider the undisclosed information significant to the deliberations of a reasonable investor. *Northway*, 426 U.S. at 450, 96 S.Ct. at 2133.

 Even if the undisclosed facts are material, however, Rule 10b–5 will not provide liability unless the defendant was under a "duty to speak." *Chiarella v. United States*, 445 U.S. 222, 235, 100 S.Ct. 1108, 1118, 63 L.Ed.2d 348 (1980); *Flynn Bros. v. Bass Bros. Enterprises, Inc.*, 744 F.2d 978, 984 (3d Cir.1984); *Staffin v. Greenberg*, 672 F.2d 1196, 1202 (3d Cir.1982); *Starkman v. Marathon Oil Co.*, 772 F.2d 231, 238 (6th Cir.1985), *cert. denied*, 475 U.S. 1015, 106 S.Ct. 1195, 89 L.Ed.2d 310 (1986); *Cf. Zweig v. Hearst Corp.*, 594 F.2d 1261, 1266 (9th Cir.1979) (holding that Rule 10b–5 requires disclosure of all material facts). Such a duty exists where the corporation has made affirmative statements regarding the complained-of matter. *Flynn Bros.*, 744 F.2d at 984; *Starkman*, 772 F.2d at 238.

Defendants cite a line of decisions beginning with *S.E.C. v. Texas Gulf Sulphur Co.*, 401 F.2d 833 (2d Cir.1968), *cert. denied sub nom. Coates v. S.E.C.*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969), which address a defendant's duty to disclose "present facts which signal or influence future patterns" of corporate activity. *Harkavy*, 571 F.2d at 741. Defendants argue that a finding of a Rule 10b–5 duty to disclose the events leading to the April, 1984 write-down would incorrectly compel them to have divulged "the benefit of [their] superior ... analysis by disclosing ... educated guesses or predictions." *Texas Gulf Sulphur*, 401 F.2d at 848. They claim that the possibility of a write-down was so remote throughout the class period

that they were under no obligation to disclose either the facts or the discussions which eventually led to it.

This line of argument is inapposite. *Texas Gulf Sulphur* dealt with the imposition of a duty to speak in the context of insider silence regarding novel developments which were not addressed by prior statements. In contrast, this case presents a situation in which Engelhard's "duty to speak" arose due to the very fact that the company made statements concerning the health of its refining operations. In the Third Circuit, the making of an affirmative statement on a securities matter triggers a duty to include such information as would prevent the statements from misleading a reasonable investor. *See e.g., Eisenberg v. Gagnon*, 766 F.2d 770, 776–77 (3d Cir. 1985), *cert. denied sub nom. Weinstein v. Eisenberg*, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (upholding that part of a jury instruction that liability requires an affirmative statement coupled with material omissions); *Flynn Bros.*, 744 F.2d at 984 (holding that a duty to speak arises when affirmative description of a tender offer is made); *Staffin*, 672 F.2d at 1204 (holding that affirmative statements trigger a duty to speak). Indeed, this rule may be found within *Texas Gulf Sulphur* itself. *Texas Gulf Sulphur*, 401 F.2d at 861–64. Plaintiff's "material omission" claim does not rely on some undisclosed-but-approaching event. Rather, it relies on the presence of affirmative statements rendered misleading by material omissions which, in the words of *Texas Gulf Sulphur*, deprived plaintiff and those similarly situated of "the disclosure of basic facts" which would have allowed them to "draw upon their own evaluative expertise in reaching their own investment decisions with knowledge equal to that of the insiders." *Id.* at 848–49.

The applicable principles, therefore, demand a two-step inquiry. First, the court must determine whether the omitted facts were "material" under *Northway*. If the facts are material, they must be compared with any affirmative statements made by Engelhard regarding the two refineries to

determine whether the statements were rendered misleading by the omission. *Staffin,* 672 F.2d at 1202. Summary judgment may be granted only if no reasonable fact finder could find for Jaroslawicz using these criteria.

Plaintiff's complaint centers around two material omissions. First, Jaroslawicz contends that Engelhard planned to write down the Newark and Sheffield facilities before April 5, 1984. In support of this contention, Jaroslawicz points to the decreasing capital expenditures made on both factories, the idling of much or most of their productive apparati, and the high number of lay-offs and terminations at the plants.[8] These facts, however, cannot even raise an inference that Engelhard's management had made a prior decision to write down these facilities. At most they infer executive ineptitude; "'Congress by [section] 10(b) did not seek to regulate transactions which constitute no more than internal corporate mismanagement.'" *Santa Fe Indus., Inc. v. Green,* 430 U.S. 462, 477, 97 S.Ct. 1292, 1303, 51 L.Ed.2d 480 (1977) (*quoting Superintendent of Ins. v. Bankers Life & Cas. Co.,* 404 U.S. 6, 12, 92 S.Ct. 165, 169, 30 L.Ed.2d 128 (1971)).

The record, however, is not entirely silent regarding a pre-planned write-down. One of the exhibits submitted by Jaroslawicz is a memorandum by Robert Pudlack, the Coopers & Lybrand manager in charge of an Engelhard audit. The memorandum, written on August 8, 1983, purports to record a meeting held five days earlier between Coopers & Lybrand and Engelhard personnel. The meeting was attended by Irving Isko, President, C.E.O. and Director of Engelhard, and by S.N. Roseberry, Engelhard's Vice President and Controller. Pudlack's memorandum relates that:

The meeting was held at Engelhard's request and related to the Company's proposed treatment of a write-down of

certain P.P. & E. [Plant, Property & Equipment] at Delancy Street....

\* \* \* \* \* \*

We were informed by Isko that the Company intends to have an appraisal of the going concern value of the refining operations performed as a basis to recover a write-down of the P.P. & E.

We agreed that a write-down was appropriate....

... Isko expressed his concern about the adverse impact of a Delancy Street write-down on the trend of earnings. He further stated that the write-down is a recognition of inappropriate decisions made by predecessor management.... He requested our assistance to conceptualize a manner by which the impact of the write-down would not affect the earnings trends....

Plaintiff's Exhibit "G," pp. 1–2. The memorandum indicates that both Isko and Roseberry received copies. *Id.*

This memorandum treats the write-down as an established fact, rather than a hypothetical alternative. It is evidence from which a jury could well find that responsible persons in Engelhard's management had determined a full year in advance of the April 5, 1984, announcement to write down the Newark facility. A reasonable jury could also conclude that Isko's exhortation that Engelhard "conceptualize a manner" of rendering the write-down harmless to the company's financial position was an open invitation to mislead the public as to the nature of the event.

Defendants point out that Pudlack was informed in 1984 by Mr. Tom Fitzpatrick, another Coopers & Lybrand partner present at the August 3, 1983 meeting, that his memorandum "did not represent the sense of the meeting." Deposition of Pudlack at p. 81. Pudlack subsequently repudiated his earlier memorandum; he testified that the August 3, 1983 discussion

---

8. For example, capital expenditures at the Newark refinery dropped from $1.44 million in 1979 to $680,000 in 1983. Plaintiff's Exhibit "K." Employment at the Sheffield facility decreased from 308 employees at the end of 1982 to 110 by the end of 1983. Plaintiff's Exhibit "T." Other submissions indicate that the degree of refining activity at both plants was significantly reduced during the same period. *See* Plaintiff's Exhibit "Q" (an Engelhard memorandum discussing reductions in Sheffield's capacity); Deposition of Holley, p. 24 (stating that the Newark plant had been "almost entirely mothballed" since the end of 1982).

concerned a possible option, rather than a determined course of action. *Id.* at 76–77. Apparently, none of the other persons listed on the memorandum's distribution section informed Pudlack of his error. *Id.* at 81–93.[9]

Pudlack's August 8 memorandum is also contradicted by the testimony of other witnesses to the effect that a write-down was not planned in 1983. *See e.g.*, Deposition of Isko at pp. 41, 43–44; Deposition of Holley at p. 25. But it should be noted that Fitzpatrick's request for redaction came almost one year after the August 3 meeting, in the context of an S.E.C. request to examine memoranda of that meeting. *Id.* at 81. Indeed, when asked what "caused" his revisionist communications with Fitzpatrick, Pudlack responded by identifying the S.E.C.'s request. *Id.*

■ Pudlack's first memorandum, when compared with both Engelhard's affirmative statement of April 5, 1984, and the company's earlier statements about the management of the plants, could be considered to reveal a misleading omission of a material fact. The conflicting versions of what transpired at the August 3, 1983 meeting, as well as the circumstances surrounding Pudlack's alteration of his memorandum, create a genuine issue as to whether Engelhard planned a write-down long before the 1984 announcement. Because the credibility of witnesses is patently within the province of the jury, *Losch v. Borough of Parkesburg*, 736 F.2d 903, 909 (3d Cir.1984); *Donovan v. Metropolitan Dist. Council*, 620 F.Supp. 131, 133 (E.D. Pa.1985), the state of the evidence on this issue precludes summary judgment.

■ The court now addresses Jaroslawicz's claim that Engelhard's statements about the Newark and Sheffield refineries were rendered misleading by the omission of material facts concerning those plants' operation. In doing so, the court notes that Engelhard's refining operations were, as Engelhard wrote in its 1982 annual Report, one of two "principal segments" of

the company's operations. Plaintiff's Exhibit "F," p. 28. Indeed, Mr. Milton Rosenthal, a former Chairman of Engelhard's Board of Directors, testified that:

> The refinery in a precious metal operation for a large precious metals company is an almost indispensable part of the conduct of such a business environment. If a large precious metals manufacturing company does not have a refinery of its own, it is at a basic commercial disadvantage in dealing with its competitors....

Deposition of Rosenthal, p. 20. Rosenthal, and Engelhard's reports, spoke of the company's refining capacity in general. However, Rosenthal also addressed the Newark and Sheffield facilities:

> [T]he conduct of the business of the refinery at Newark was important and that was because it was the primary refining facility in the United States for Engelhard.
>
> The refinery at Sheffield was primarily dedicated to silver refining, and while it was the principal refining facility of Engelhard in England, the refining operation of Engelhard in England was not anywheres [*sic*] near the same magnitude of importance as the total refinery at Delancy Street....

*Id.* at 26. The importance which Engelhard attached to its own refining operations must be borne in mind when evaluating its public statements concerning them.

During the period 1982–84 Engelhard made several public statements which referred to the Newark and Sheffield refineries. In 1982, "Interim Reports" to Engelhard's shareholders discussed the development of difficulties with the refining facilities. One statement informed the owners that:

> The weakness in this quarter's result was the refinery business conducted in the Newark facility which has been operating at reduced levels because of the recession, particularly as compared to the first quarter of 1981 which benefitted from business originating in 1980.

---

**9.** Pudlack did state, however, that he believes Isko so informed him because he is "sure that if [he wrote] this [repudiating] memo, [Isko] did

say something to that effect." The credibility of this statement is obviously a question for the jury.

Exhibit 10 to Affidavit of Richard D. Catenacci.[10] A second interim statement spoke of improvements at the plants:

> During 1982's second quarter, we streamlined the operation of the Newark refinery to improve the efficiency of our refining business. Substantial reductions were made in the number of personnel at that facility as well as related service functions, and changes in processing techniques were implemented. The expenses associated with this program have to a considerable extent been absorbed in this second quarter earnings, but the resulting profit improvement will become evident only in subsequent periods.

Catenacci Exhibit 11. Finally, Engelhard's 1982 Annual Report spoke of measures taken "[i]n response to the adverse impact of worldwide economic conditions:"

> on the refining operations ... a program to introduce cost-effective specialization and to streamline the organization of certain of our facilities was ... substantially completed in 1982. The costs of this program have been partially offset by gains derived from the reduction of inventories as an integral part of this effort.

Plaintiff's Exhibit "F." The record does not include references to Engelhard's Sheffield establishment, except for this statement in its first Interim Report:

> Our United Kingdom business also advanced with improvement in profits in this first quarter over the first quarter of the previous year.

Catenacci Exhibit 10. These statements are facially straightforward; they discuss Engelhard's concerns over the Newark facility's decreased profits and inform the owners that measures are being taken to improve the plant's health.

But in February of 1982, Isko and Colton presented Engelhard's Board with a study of Newark's "total" refinery that indicated the plant was in "a critical stage of deterioration" which "constitut[ed] an intolerable situation." It was estimated that, by the end of 1982, the plant would lose $15 million dollars unless immediate steps were taken to remedy its defects. The report stated that Newark's losses were caused by seriously erroneous design; "inadequate" management; out-of-date processes and technology; a lack of "[c]ommercial wisdom" regarding plant management and contracts; poor inventory control; and "inexpert" staffing practices.[11] Another measure of these problems is a 1980 independent evaluation referred by the February report, which stated that at least $8.8 million must be spent to improve only part of the Newark refinery as "an absolute minimum for the efficient functioning of the refinery." That report also stated that "[f]or commercial viability under normal market conditions further major capital expenditures would be called for." *See* Plaintiff's Exhibit "B." [12]

The Isko report advised that "certain operations" at Newark should be terminated "in favor of using more intensively our facilities in England and elsewhere." The number of persons employed at the plant—to whom Engelhard cryptically refers as "headcount"—was to be reduced from 410 persons to 225 by the end of 1982. Measures in other areas of Engelhard's business were also discussed, and the report concluded by stating that "a long-range program for profitability in refining" would be presented to the Board. *Id.*

Another memorandum written by A.J. Shaw, Engelhard's assistant controller, records a December 1982 meeting between

---

10. Henceforth "Catenacci Exhibit."

11. That report also determined that "[e]nvironmental costs have escalated. We have persisted in attempting to discharge deleterious contaminants, notwithstanding intense regulation."

12. Because defendants have not presented further evidence concerning these studies, the court is obliged to infer that such were not contradicted, and that they were conducted with full preparation and funding. *See Panter v. Marshall Field & Co.,* 646 F.2d 271, 292–93 (7th Cir.1981), *cert. denied,* 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981) (setting forth criteria for attributing evidentiary weight to an internal report).

Engelhard's accountants and Roseberry, Engelhard's Vice President and Controller. The memorandum treats "the approximately $18 million of nonrecurring losses resulting from programs to streamline and introduce specialization at Newark and Sheffield." It determines that these losses are to be offset by sales from Engelhard inventory and concludes that nondisclosure of this measure was not "considered misleading with respect to ongoing operations." The memorandum also states that "it was pointed out that disclosure of the magnitude of the refinery losses could lead to even more severe predatory practices by our competitors with adverse consequences for our stockholders." The document concludes by stating "that it was decided ... that it was appropriate to bring [illegible] the world-wide [illegible] of refining activity and the changes made by Engelhard to the attention of the annual report readers...." Plaintiff's Exhibit "D."

Yet another memorandum is entitled "REVISED REFINING OPERATING STRATEGY." Apparently written in or near June of 1982,[13] the document contains plans for a further reduction of personnel to 60 by the end of the year. Noting that "[w]e must get relief!," the memorandum also contains a plan to "phase out all refining operations at Delancy Street leaving only preparation and sampling." Plaintiff's Exhibit "C."

Plaintiff's Exhibit "K" is entitled "Delancy Street—Capital Expenditures." It states that the amounts which Engelhard spent on its facilities at Newark during 1982 decreased from Engelhard's 1981 level of $5.58 million, to $3.81 million dollars.

Engelhard's Sheffield facility contained three "circuits" of refining operations, each designed for differing qualities of raw materials. As discussed above, the facility was primarily dedicated to silver refining. A Coopers & Lybrand memorandum states that "[d]uring 1982, the Company suspended ... a portion of its Sheffield operations." Plaintiff's Exhibit "E." A letter from Engelhard's Vice President and Gen-

eral Counsel, Mr. Arthur Dornbusch, states that Engelhard decided to suspend one of Sheffield's "circuits" in "late 1982." Plaintiff's Exhibit "L." Capital expenditures on Sheffield decreased from $1.81 million dollars in 1981 to $0.94 million in 1982. Plaintiff's Exhibit "U." Finally, in December of 1982, Engelhard laid off 153 Sheffield workers. *Id.*

Engelhard was more prolix about its refining operations in 1983; during that year it issued a total of eight statements. In a 10–Q Report, Engelhard stated that:

> solid earnings results were derived from the continuing strong performance of the Company's businesses.... Also contributing significantly to these earnings were gains from the 1982 improvements in the Company's precious metal refining operations.

> \* \* \* \* \* \*

> The company's overseas activities were particularly strong in its Australian and Japanese affiliate in addition business conditions of our English precious-metal chemical operations improved although English and Itallian metallurgical operations were adversely affected by weak local demand. [*sic passim*]

Its 10–K statement for the period ending December 31, 1983 said that:

> The Company's processing and refining facilities, plants and mills are suitable and adequate and have sufficient capacity for its normal operations. Overall, these facilities were substantially fully utilized during the year, except for excess capacity in certain of the Company's refining facilities.

Although Engelhard's statements to its own shareholders are particularly important to a section 10(b) inquiry, these statements are probative of the issues.

Engelhard's 1983 statements to its owners included the following disclosures in its 1983 Annual Report:

> In response to ... worldwide economic conditions on the refining operations ... a program to introduce cost-effective

---

**13.** The memorandum contains a handwritten note: "Phasing known Fri 6/4." Between 1981 and 1984, the only year in which that date fell on a Friday was 1982.

specialization and to streamline the organization of certain of our facilities was ... substantially completed in 1982. The costs of this program have been partially offset by gains derived from the reduction of inventories as an integral part of this effort.

\* \* \* \* \* \*

Net earnings were the highest in the Company's history, including the two decades prior to 1981....

\* \* \* \* \* \*

Earnings from the Company's ... refining businesses increased substantially over 1982 levels. While cost reduction and better processing techniques were the principal causes of the earnings improvement, still more efficiencies must be obtained from both our U.S. and European refining operations.

\* \* \* \* \* \*

Performance in 1983 benefitted significantly from the cost reductions achieved through the restructuring of domestic refining operations in 1982. In 1983, the Company commenced a similar program at certain European refining operations, which should benefit future operating results beginning in 1984....

Plaintiffs contend that these statements omitted a great deal of material information regarding the conditions at Newark and Sheffield.

Even Engelhard's witnesses state that throughout 1983, the company thought Delancy Street's condition warranted at least the consideration of a write-down. A letter from Dan Huot, a Coopers & Lybrand accountant, stated that a meeting held between himself and Engelhard employees discussed whether a write down was appropriate. Plaintiff's Exhibit "H." Holley testified that the Delancy Street facility had been "almost entirely mothballed" since December of 1982. Pudlack agreed with this evaluation, testifying that "the majority of the [Delancy Street] refinery operations were not in operation" by the end of 1983. Deposition of Pudlack, p. 112. Capital expenditures at the New Jersey factory decreased again from the 1982 level of $3.81 million, to $0.68 million in 1983. Plaintiff's Exhibit "K."

Engelhard also made statements concerning its Sheffield facility in 1983:

In addition, business conditions of our English precious metal chemical operations improved, although English and Italian metallurgical operations were adversely affected by weak local demand.

\* \* \* \* \* \*

Profit from precious metal ... operations and related refining in Europe grew over last year as these businesses posted increased sales.

\* \* \* \* \* \*

Major refineries are operated in New Jersey, California, Canada, England, Australia, France, Italy and Japan.

Two statements refer specifically to Engelhard's English operations, while one includes them in an overall reference to "Europe."

During 1983 Engelhard's capital expenditures at Sheffield decreased from $.94 million (in 1982) to $.22 million. Plaintiff's Exhibit "V." The number of personnel at Sheffield employed in refining operations dropped from 308 (at the end of 1982) to 110; the total decreased from 772 to 419 during the same period. Plaintiff's Exhibit "T." Indeed, an internal memorandum dated December 6, 1983, stated that "[a]t meetings on October 13 and 14 it was decided that we should close the Sheffield site in two phases...." Plaintiff's Exhibit "N." A proposed timetable was drawn up which provided for the announcement of "redundancies" (i.e., unemployable workers); appropriate union settlements; and "clean-up of inactive refinery equipment" and buildings. These measures were to begin in October of 1983, and were to be completed by February of 1984. Plaintiff's Exhibit "P." Sheffield's "sweep" circuit had already been shut down the previous year; Engelhard now appeared to plan the closure of the rest of the facility. The December 6 memorandum detailed a planned reduction of metal refining tonnage; one "circuit" was to reduce its tonnage from eighty to zero by the end of the

year, while the remaining circuit was to decrease from forty-seven tons to two. Plaintiff's Exhibit "N."

Finally, in 1984 plaintiffs allege that Engelhard made the following statement on March 31:

> The company's processing and refining facilities, plants and mills are suitable and adequate and have sufficient capacity for its normal operations.
>
> Overall, these facilities were substantially fully utilized during the year, except for excess capacity in certain of the company's refining facilities.

Plaintiff's Memorandum p. 31. Then, on April 5, 1984, Engelhard announced its $36 million write-off. Engelhard's stock value dropped sharply from $20.67 per share at April 5 to $18.25 per share on April 11—a total of 11% in four business days.

With these facts in mind the court now turns to the legal inquiry of "materiality." May the court say, as a matter of law, that the undisclosed information did not have a "substantial likelihood" of altering the path of investor deliberations? The answer is clearly in the negative. The facts set forth above detail Engelhard's substantial losses at two major installations, each part of one of Engelhard's two major manufacturing divisions; Engelhard's decreasing *capital* expenditures on the factories;[14] its steadily-mounting reductions in employees; the cessation of virtually all activity at the plants; and Engelhard's conclusion that the difficulties at Newark resulted from that plant's poor design and management. Further, the price of Engelhard stock dropped in value 11% in four days, thereby indicating the materiality of the omitted information. *See Kronfeld v. Trans World Airlines,* 832 F.2d 726, 736 (2d Cir. 1987) *cert. denied,* —— U.S. ——, 108 S.Ct. 1470, 99 L.Ed.2d 700 (1988) (holding that decline in stock value is an index of materiality). The court will not hold, as a matter of law, that no reasonable investor could consider this information "material."[15]

Defendants also argue that the presence of alternative sources of public information rendered any omissions in their own statements immaterial. They rely on *Northway,* which commands the court to determine whether the above omissions were material in light of the "'total mix' of information made available" to the public. *Northway,* 426 U.S. at 449, 96 S.Ct. at 2132. In support of this argument defendants direct the court's attention to Catenacci Exhibits 16 through 20, copies of reports from several stock analysts[16] which are frank in their discussion of Engelhard's refining difficulties. A representative evaluation is that of Ingalls & Snyder, which stated that Engelhard's:

> huge Newark refinery has had special problems. In the words of one member of the management, it was designed as a mill whereas the business really consists of batch operations. The present management has mothballed much of its operations and reduced its employment by 400 to 500 people.

The report went on to state that Engelhard's profits "have been burdened with

---

**14.** Particularly striking in this regard is the fact that Engelhard reduced capital expenditures at the Newark facility from $5.58 million dollars to $0.68 million during 1981–83. (Plaintiff's Exhibit "K.") Yet the company's commissioned management study recommended, in 1980, that *at least* $8.8 million should be expended on part of the Delancy Street facility, with "further major capital expenditures" recommended to obtain "commercial viability under *normal* market conditions." *See* Plaintiff's Exhibit "B," p. 4 (emphasis supplied).

**15.** Defendants argue that this determination violates the Supreme Court's caution against construing "materiality" to require burying investors in an "avalanche of trivial information." *Northway,* 426 U.S. at 448, 96 S.Ct. at 2132. The court's determination will not lead to an avalanche of trivia. As the discussion above makes plain, the facts identified by plaintiff are far from trivial; they strike at the heart of Engelhard's business operations and profitability. The court cannot conclude they were immaterial as a matter of law without construing "materiality" in a manner which would virtually absolve corporations from disclosing adverse developments.

**16.** They are: Dean Witter Reynolds, Inc. (Exhibit 16); Paine Webber Mitchell Hutchins, Inc., (Exhibit 17); Smith Barney Harris Upham & Co., (Exhibit 18); Merrill Lynch Pierce Fenner & Smith, Inc., (Exhibit 19); and Ingalls & Snyder (Exhibit 20).

huge costs of cutting back employment and closing down various facilities, particularly at Newark." Catenacci Exhibit 20. Defendants also point to Exhibit 21, a press release from Engelhard containing an announcement of reductions in Engelhard's Sheffield workforce. All were released in 1982. Engelhard contends that these statements were fulsome enough to ward off a determination that its omissions were material.

These releases, however, do not have the nugatory effect on the "total mix" of public information envisioned by *Northway*. In reaching this determination the court is mindful of the recent observations made by Chief Judge Gerry in *In re Western Union Sec. Litig.*, 120 F.R.D. 629 (D.N.J.1988). Confronting a similar argument [17] concerning statements and releases made to the media, Judge Gerry wrote:

> [T]his argument ... almost appears to concede that [Defendant's] actual report[s] ... were misleading. Putting this curious aspect aside ... [e]ven if some curative information were available to the public, that would not eliminate the alleged misrepresentations that had also been disseminated ... [and which could] certainly have played a role in setting an artificial market price.... [A]cceptance of defendants' argument would send a message to corporations and others that they need not be bound by the disclosure requirements of the

federal securities laws as long as ... some accurate information otherwise exists.

*Id.* at 638. Each of these reports appeared in 1982, and therefore could have had little, if any, effect on Engelhard's disclosures about refining conditions in 1983. Further, no evidence has been offered regarding the public currency of these materials.[18] The only exception is the Ingalls & Snyder report quoted above, which was distributed to "probably less" than 100 persons. Plaintiff's Exhibit "Y." The court finds Judge Gerry's reasoning in *Western Union* equally applicable to Engelhard's "total mix" argument.[19]

█ Having determined that the omitted facts were material, the court must now consider whether a reasonable jury could determine that the omission rendered Engelhard's affirmative statements misleading. A "misleading" statement is one which, when viewed in the light of the circumstances under which it was made, presented a false report of the facts. *See Associated Builders, Inc. v. Alabama Power Co.*, 505 F.2d 97, 101 (5th Cir.1974); *Panter v. Marshall Field & Co.*, 646 F.2d 271, 289 (7th Cir.1981) *cert. denied*, 454 U.S. 1092, 102 S.Ct. 658, 70 L.Ed.2d 631 (1981); *In re Union Carbide Class Action Sec. Litig.*, 648 F.Supp. 1322, 1326 (S.D.N.Y.1986); *Crystal v. Foy*, 562 F.Supp. 422, 428 n. 2 (S.D.N.Y.1983).

---

17. Essentially, the *Western Union* defendants argued that plaintiff class could not have relied solely on defendants' statements. *Western Union*, 120 F.R.D. at 636–37. The court, however, does not consider *Western Union* to be direct authority; that case concerned class certification, while this opinion deals with a class's victory. Nonetheless, the court thinks Judge Gerry's observations relevant to any "total mix" argument.

18. The only exception is a copy of the June 22, 1982 issue of the *Wall Street Journal*. On that day the paper carried a four-line paragraph stating that personnel at the Newark refinery "and related operations" would be reduced to 120 employees. Catenacci Exhibit 13. Apparently this was the only publication of the June 21, 1982 press release. This terse reference could not have significantly altered the "total mix" of public information about Engelhard's refining operations, nor could it have done so in 1983.

19. It is helpful to note here that shareholders own the corporation. The reports cited by Engelhard were specialized intelligence, available only to a few subscribers. Therefore, acceptance of Engelhard's "total mix" argument would subvert the very purpose of the securities laws by virtually requiring owners to spy on their own property in order to obtain truthful information regarding its management. Such a result hardly comports with the securities laws' "'fundamental purpose' ... [i.e.,] to substitute 'a philosophy of full disclosure for the philosophy of *caveat emptor* and thus to achieve a high standard of business ethics.'" *Affiliated Ute Citizens v. United States*, 406 U.S. 128, 151, 92 S.Ct. 1456, 1471, 31 L.Ed.2d 741 (*quoting S.E.C. v. Capital Gains Research Bureau*, 375 U.S. 180, 186, 84 S.Ct. 275, 280, 11 L.Ed.2d 237 (1963)).

When read in the light most favorable to plaintiffs, Engelhard's statements may be reasonably considered "misleading" when set against the omitted material facts. The most incisive Engelhard comment on the Newark and Sheffield facilities were its brief statements in 1982 and 1983 that:

a program to introduce cost-effective specialization and to streamline the organization of certain of our facilities was ... substantially completed....

1982 Annual Report; 1983 Annual Report. Virtually all of Engelhard's public statements attributed the need for "streamlining" to either international or domestic economic conditions. *See* 1982 Annual Report, 1983; Annual Report; 1982 Interim Report; 1983 10–Q Report. Indeed, Engelhard's statements spoke of "solid earnings results," which were partially "derived from the ... gains from the 1982 improvements in the Company's ... refining operations." 1983 10–Q Report. Aside from the "substantially" fulfilled need to streamline its operations, the only sour notes in Engelhard's statements referred to "excess capacity in certain of the Company's refining facilities," 10–K Statement December 31, 1983, and the recognition that "still more efficiencies must be obtained from both our U.S. and European refining operations." 1983 Annual Report.

The company's releases give the impression that "streamlining" to obtain renewed economic vigor had been "substantially completed" in 1982, resulting in "solid earnings results" by 1983 despite "excess capacity." But Engelhard's own appraisal of its Newark and Sheffield refining facilities presented a different picture. The facilities suffered from poor management decisions, and were (in the case of Newark) losing at least $1 million dollars every thirty days. The record indicates that the Newark facility was "virtually mothballed" by 1982, and that a decision to cease operation at Sheffield had been made by the beginning of 1983. A reasonable jury could well find that Engelhard's statements, without more as to the economic conditions of the Newark and Sheffield refineries, were misleading as to the health of the company's refining operations.

■ Finally, the court must turn to the issue of scienter. "[A] plaintiff in a Rule 10b–5 non-disclosure action must show more than mere negligence. 'Scienter—intent to deceive, manipulate or defraud—must be shown.'" *Harkavy*, 571 F.2d at 741 (*quoting Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193, 96 S.Ct. 1375, 1381, 47 L.Ed.2d 668 (1976)); *Bullock v. Administrator of Kircher's Estate*, 84 F.R.D. 1, 6 (D.N.J.1979). The Supreme Court has not decided whether recklessness may support Rule 10b–5 liability. *Hochfelder*, 425 U.S. at 194 n. 12, 96 S.Ct. at 1381 n. 12. But the Third Circuit has held that recklessness may fulfill the scienter requirement, saying that "recklessness" means:

'highly unreasonable [conduct] involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.'

*McLean v. Alexander*, 599 F.2d 1190, 1197 (3d Cir.1979) (*quoting Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1045 (7th Cir.1977), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977)). In a non-disclosure action, *Hochfelder*'s "core requirement ... is that the plaintiff establish that the defendant lacked a genuine belief" that his statements were "accurate and complete in all material respects." *McLean*, 599 F.2d at 1198. As with all judicial determinations of state of mind, a 10b–5 plaintiff need not:

produce direct evidence.... Circumstantial evidence may often be the principal, if not the only, means of proving bad faith. A showing ... [that] the 'danger of misleading ... [was] so obvious that the actor must have been aware of it' [will suffice].

*Id.* at 1198 (*quoting Sundstrand*, 553 F.2d at 1045); *and see Healey v. Catalyst Recovery, Inc.*, 616 F.2d 641, 648 (3d Cir.1980) (holding that recklessness is not "indifference to the consequences," but is "relatively close to intentional misconduct.").

There is evidence from which a jury could infer that Engelhard's behavior did not even approach the standard set by *Mc-Lean* and *Healey*. Holley testified that prior to his election as Engelhard's President and Chief Operating Officer, he had been engaged in determining whether and how the profitability of the company's refining operations could be improved. Deposition of Holley at pp. 29–30, 42. Several options were being discussed, such as selling the Sheffield facility, moving the Newark operations; or completely restructuring the entire refining operations. *Id.;* Catenacci Exhibits 3 & 4; Deposition of Fitzpatrick, p. 45. In 1983 Engelhard commissioned another study by the Jacobs Engineering Group (the same firm who performed the 1980 study mentioned above), and was awaiting its report in March of 1984. *Id.* at 30–31; Catenacci Exhibit 2. As late as the beginning of 1984, defendants could plausibly be said to have believed that the factories would again become profitable. A December 13, 1983, memorandum by Huot states that Engelhard management "felt . . . any future rise in precious metals prices would make the reopening of the [Newark] refinery profitable." Catenacci Exhibit 3.

Even the discussions of a write-down may be seen in a light favorable to Engelhard. Former Chairman of the Board Rosenthal described such discussions thus:

> [A]ny responsible management of a company will normally do a great deal of contingency planning on a 'what if' basis, and in the case of the refinery, which had shown disappointing results, it would have been normal for the management to discuss what the consequences might be of a closure of the refinery; but the decision with respect to closure was not made until the Spring of 1984, but I do not find it inappropriate for a management to have conjured [*sic* ] with the question of 'what if' at an earlier date.

Deposition of Rosenthal, pp. 48–49. Indeed, the exhibits presented to the court may show that Engelhard's Board was unaware of the necessity for a write-down

until April 1984. *See id.;* Deposition of Mr. Keith, p. 25; Deposition of Mr. Cook, pp. 27–28.

Nevertheless, it cannot be said that no reasonable jury could consider the evidence incapable of demonstrating recklessness. Even without a determination that Pudlack's August 8, 1983 memorandum is credible, the record may reasonably be read to display recklessness on the part of Engelhard's management.

First, one has the 1980 Jacobs study, which determined that at least $8.8 million dollars was required to improve part of the Newark facility as "an absolute minimum" for continued commercial viability, and which went on to state that "commercial viability under normal market conditions [required] further major capital expenditures." *See* Plaintiff's Exhibit "B." The weight to be given this study may well be indicated by Engelhard's own reliance on the same firms' later efforts in order to demonstrate the company's good faith. Yet, while Engelhard's management informed the company's owners that its "substantially completed" improvements were producing "solid earnings returns," the record indicates that capital expenditures fell from $5.58 million dollars in 1981 to $.68 million in 1983. Plaintiff's Exhibit "K."

Second, one has the uncontradicted testimony of Mr. Rosenthal that the Delancy Street facility was losing as much as $1 to $2 million dollars *per month* until 1983. Deposition of Rosenthal, p. 67; *and see* Plaintiff's Exhibit "L." Engelhard's own study had determined that primary responsibility for this "bleeding," [20] lay with poor management decisions, rather than "worldwide economic conditions." Plaintiff's Exhibit "B."

Third, one must determine the effect on a reasonable jury of Engelhard's ever-surfacing concern about the impact of public disclosure. Repeatedly, disclosure of these conditions was decided against due to the "adverse impact" which such knowledge would have on the business milieux in

---

**20.** The word is used by Engelhard's general counsel, Mr. Dornbusch. Plaintiff's Exhibit "L."

which Engelhard moved. *See* Plaintiff's Exhibits "D" (1982 memorandum detailing management concern over impact of information); *and* "G" (1983 memorandum noting Isko's desire to "conceptualize" a write-down in a manner which would not hurt the trend of earnings). While the securities laws will not provide liability for failure to portray the company in a negative light, the concern of Engelhard's management may reasonably be taken into account with its other actions in order to determine whether management was reckless.

Engelhard made the following statements which related to its Sheffield facility in 1982 and 1983:

> Our United Kingdom business also advanced with improvement in profits in this first quarter over the first quarter of the previous year.

* * * * * *

> In addition, business conditions of our English precious metal chemical operations improved, although English and Italian metallurgical operations were adversely affected by weak local demand.

* * * * * *

Major refineries are operated in … England. Yet capital expenditures and employment at Sheffield, Engelhard's "principal refining facility … in England," (Deposition of Rosenthal, p. 26) were reduced by a magnitude comparable to that at Newark. Plaintiff's Exhibits "T" and "U." Indeed, in 1983 Engelhard had decided to close Sheffield "in two phases." Plaintiff's Exhibit "Q."

Even this cursory review of the evidence reveals that it cannot be said as a matter of law that Engelhard's statements and the facts behind them do not reveal "an extreme departure from the standards of ordinary care," thereby presenting a danger of misleading investors which was so obvious that Engelhard must have been aware of it. *McLean,* 599 F.2d at 1197.

Therefore, the court concludes that Engelhard has failed to demonstrate that no reasonable jury could conclude that the company's conduct during the class period violated Section 10(b) and Rule 10b–5.

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 257, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986). The posture of this case presents numerous genuine issues of material fact which demonstrate the need for trial. Defendants' motion for summary judgment is denied. An order has been filed. No costs.