724 F.Supp. 294 (1989)
Moses JAROSLAWICZ, Individually and on Behalf of All Others Similarly Situated, Plaintiff,
v.
ENGELHARD CORPORATION, et al., Defendants.
Civ. No. 84-3641 (CSF).
United States District Court, New Jersey.
June 19, 1989.
*295 Gladstone & Hart, Hackensack, N.J. by Marvin H. Gladstone, Barrack, Rodos & Bacine by Leonard Barrack, Sheldon L. Albert, and Samuel R. Simon, and Levin, Fishbein, Sedran & Berman, Philadelphia, Pa. by Howard J. Sedran and Arnold Levin, for plaintiff.
Connell, Foley & Geiser, Roseland, N.J. by Richard D. Catenacci and Liza Walsh, Cahill, Gordon & Reindel, New York City by Raymond L. Falls, Jr., Howard G. Sloane, and Anthony Paduano, for defendants, Engelhard Corp., Irving Isko, Milton F. Rosenthal, Nelson B. Colton, Frederick H. Cook, Cyrus H. Holley, Carl D. Keith, Reuben F. Richards, R. Keith Elliot, Orin R. Smith, S.N. Roseberry, Jr. and Carl E. Peterson.
CLARKSON S. FISHER, District Judge.
Before the court are several motions by Engelhard Corporation and the other defendants.[1] First, defendants seek the dismissal of the plaintiff's claims under New Jersey law. Second, defendants ask that I exclude evidence relating to a request for information made by the Securities Exchange Commission ("SEC"). Third, defendants want to reserve the award of damages to the proof-of-claim phase of this *296 class action suit. I have considered the parties' written submissions and oral argument. For the reasons discussed below, Engelhard's first and second motions are denied, and its third motion is granted.
As to Engelhard's first motion, plaintiff's complaint alleges state-law counts for negligent misrepresentation and fraud. See generally Rosenblum v. Adler, 93 N.J. 324, 334, 461 A.2d 138 (1983) (discussing negligent misrepresentation); Enright v. Lubow, 202 N.J.Super. 58, 72, 493 A.2d 1288 (App.Div.1985), certif. denied, 104 N.J. 376, 517 A.2d 386 (1986) (discussing fraud). Jaroslawicz's sole actionable purchase of Engelhard stock occurred in January, 1984. At a deposition, Jaroslawicz testified that Engelhard's 1981 and 1982 annual reports did not influence his 1984 purchase.[2] He testified:
A: I purchased [Engelhard securities] because it was a solid company and I wanted to be sure the principal is granted.
Q: What did you base your view it was a solid company on?
A: Since I had success with them.
Q: The price had gone up for the stock; is that not right?
A: Yes.
Q: That is what you based your view it was a solid company on?
A: Right, correct.
Defendants' Brief in Support, p. 3 (quoting Deposition of Jaroslawicz, pp. 64-65). Engelhard observes that reliance is an element of both negligent misrepresentation and fraud, see Rosenblum, 93 N.J. at 334, 461 A.2d 138; Enright, 202 N.J.Super. at 72, 493 A.2d 1288, and that the fraud-on-the-market theory of reliance is unavailable to Jaroslawicz. See Peil v. Speiser, 806 F.2d 1154, 1163 & n. 17 (3d Cir.1986) (noting that no state has adopted the theory). Because plaintiff testified that he did not rely on Engelhard's statements, defendants conclude that both state-law claims should be dismissed.
In opposition, plaintiff has submitted other deposition testimony which supports direct reliance. In these selections, Jaroslawicz was asked whether he received:
[Q]: Any documents at all which led you to purchase the Engelhard stock in 1984?
A: No.
Mr. SEDRAN: Documents from Seabert.
BY MR. SLOANE:
Q: Any documents?
A: No. Only the reports. I depended on the reports from the company.
Q: Apart from the reports from the company, did you receive or review any documents which led you to make the decision to purchase the Engelhard stock in 1984?
A: No.
Q: Just the reports from the company?
A: Just the reports.
Deposition of Jaroslawicz, pp. 46-47 (reproduced at Exhibit B to Plaintiff's Brief in Opposition). The credibility and effect of a witness' testimony is for the jury. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986); Losch v. Borough of Parkesburg, 736 F.2d 903, 909 (3d Cir.1984); Donovan v. Metropolitan Dist. Council, 620 F.Supp. 131, 133 (E.D.Pa.1985). Defendants' motion to dismiss is denied.
Defendants' second motion has more substance. After Engelhard's write-down of its Sheffield and Delancy Street facilities, the SEC inquired about these events as well as the company's practice of considering inventory profits as income. Plaintiffs want to elicit evidence regarding this inquiry and Engelhard's response. Engelhard points to Federal Rule of Evidence 403 which states, in pertinent part, that:
Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.
Fed.R.Evid. 403. Engelhard claims that Rule 403 requires the exclusion in limine of "[a]ll references to the SEC inquiry and *297 the document relating to that inquiry." Brief in Support, p. 3.
As Rule 403 suggests, the first determination that has to be made is that of the evidence's probative value. Engelhard claims that this issue was settled by the SEC's own request for information, which stated that:
[t]his inquiry ... should not be construed as an indication by the Commission or its staff that any violations of law have occurred, nor should it be considered an adverse reflection upon any person, entity or security.
Falls Affidavit, Exhibit B (reproduced at Brief in Support, p. 4). Defendants represent that the SEC inquiry was terminated without the filing of a complaint or any other finding regarding Engelhard's compliance with security law. They conclude that the SEC request and the events surrounding it do "not satisfy the test set-out [sic] by Fed.R.Evid. 401 and has no probative value." Brief in Support, p. 4.
One of plaintiff's claims is that Engelhard management made a conscious decision to write down its Newark, New Jersey and Sheffield, England, facilities before the write down was announced on April 5, 1984. The only piece of evidence which supports this claim is a memorandum written by Robert Pudlack, a Coopers & Lybrand employee who supervised an Engelhard audit. The memorandum indicates that on August 3, 1983, Engelhard management decided to write down the Newark facility. Pudlack later retracted this statement, and has testified that the August 3, 1983, meeting only concerned a hypothetical course of action. Pudlack repudiated his first memorandum after he was told by a Coopers & Lybrand partner that it was inaccurate. The partner's comments were made after the SEC's request, which embraced information relating to the August 3 meeting. See Jaroslawicz v. Engelhard Corp., 704 F.Supp. 1296, 1300-01 (D.N.J. 1989) (discussing these events). If both Pudlack's memoranda are introduced, evidence concerning the SEC's inquiry will far exceed the low standard of relevance set by Rule 401.
Pudlack wrote one memorandum to the effect that defendants decided to write down the Newark facility over a year before announcing that fact. Pudlack also wrote a subsequent memorandum in which this account was repudiated, and in which it was said that defendants simply discussed a write down as one possible option among many. Without a reference to the SEC's request for information the facts demonstrate little more than an employee revising a report on the instructions of a superior who had read the first document and realized that it was incorrect. When such a reference is added, a jury could well determine that Pudlack's first memorandum is correct, and that his second account was made because, according to the Book of Proverbs, "[t]he wicked flee when no one pursues." Proverbs 28:1 (Revised Standard Version).
Engelhard contends any reference to the SEC will compel the conclusion not only that the Commission was pursuing the company, but also that there was good reason for the Commission to do so. In support of this argument defendants cite decisions that excluded evidence of government inquiries on the grounds of prejudice.[3] There is, however, no per se rule against the admission of governmental proceedings into evidence.[4]
Moreover, a similar use of evidence took place in Jackson v. Hollowell, 714 F.2d *298 1372 (5th Cir.1983). In that case, plaintiff's eye was destroyed by a shotgun blast fired from a weapon held by an inmate "trusty." He sued prison officials alleging that they had violated the order of a district court regarding the screening of trusty candidates and the selection of those who were ultimately permitted to carry and use firearms against their fellow inmates. The district court had found that earlier procedures used by defendants violated the constitution. The Court of Appeals upheld presentation of "certain fact findings" from the previous lawsuit to the jury "as background information regarding the existence of the armed trusty system." Id. at 1383. A limiting instruction was held to have cured any prejudicial effect which the evidence might have possessed. Id.
The SEC inquiry "is unfairly prejudicial if it `appeals to the jury's sympathies, arouses its sense of horror, provokes its instinct to punish,' or otherwise `may cause a jury to base its decision on something other than the established propositions in the case.'" Carter v. Hewitt, 617 F.2d 961, 972 (3d Cir.1980) (quoting 1 J. Weinstein & M. Berger, Weinstein's Evidence, Paragraph 403[03] at 403-15 to 403-17 (1978)).
The evidence of the SEC request may become highly relevant to a jury's consideration of the differences between Pudlack's memoranda. I am confident that, with a proper limiting instruction, the bare fact of the SEC's routine request for information will not inflame the jury to an unreasonable appreciation of the evidence. Based on the parties' submissions concerning the request, I shall instruct the jury that a request for information is something routinely made by the SEC and that the request, as the SEC itself stated, cannot be construed as an indication that the SEC considered Engelhard's actions improper.[5] The parties will proffer, before trial, appropriate instructions.
For the same reasons, other evidence offered by plaintiff which refers to the SEC request will be admitted subject to the same instruction. No reference may be made to the SEC's request for information regarding Engelhard's inventory-profit-as-income accounting practices, since plaintiff has withdrawn all claims relating to these practices. Plaintiff has offered to redact the evidence to exclude references to the SEC. Plaintiff is ordered to do so regarding the inventory matter.[6]
These measures will permit the jury to evaluate defendant's behavior and prevent the jury from inferring any that any conclusions they may reach are corroborated by a governmental agency  the main reason for excluding the evidence in the cases relied upon by Engelhard. No "mini-trial" on the history and function of the SEC will be required in order to allow a rational consideration of this evidence.
I now turn to Engelhard's final motion to reserve the award of damages to the proof-of-claim phase. Damages in a section 10b suit are computed according to the "out-of-pocket" rule, whereby "damages equal ... the difference between the price paid and the `real' value of the security, i.e., the fair market value absent the misrepresentations, at the time of the initial purchase by the defrauded buyer." Huddleston v. Herman & MacLean, 640 F.2d 534, 556 (5th Cir.1981), rev'd. on other grounds, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). Accord, Sharp v. Coopers & Lybrand, 649 F.2d 175, 190 (3d Cir.1981), cert. denied, 455 U.S. 938, 102 S.Ct. 1427, 71 L.Ed.2d 648 (1986); Glick v. Campagna, 613 F.2d 31, 36 (3d Cir.1979). *299 Engelhard argues that the jury should not award a "lump-sum" amount for the entire class. Defendants want the jury to restrict its efforts to pinpointing the fair market value of company securities during the class period. Plaintiff responds that a single award for the entire class is appropriate.
There is no hard-and-fast rule that demands either alternative. The method and time for calculating damages in a class action is governed by considerations of economy and fairness in the context of the legal theories used by the plaintiffs. Bogosian v. Gulf Oil Corp., 561 F.2d 434, 454 (3d Cir.1977), cert. denied, 434 U.S. 1086, 98 S.Ct. 1280, 55 L.Ed.2d 791 (1978); In re Antibiotic Antitrust Actions, 333 F.Supp. 278, 287-90 (S.D.N.Y.1971), mandamus denied sub nom Pfizer, Inc. v. Lord, 447 F.2d 122 (2d Cir.1971); A. Miller, "Problems in Administering Judicial Relief in Class Actions Under Federal Rule 23(b)(3)," 54 F.R.D. 501, 504-07 (1972). But see International Bhd. of Teamsters v. United States, 431 U.S. 324, 360-62, 97 S.Ct. 1843, 1867-68, 52 L.Ed.2d 396 (1977) (strongly suggesting that pattern-or-practice discrimination suits be bifurcated into liability and proof-of-damage phases). Because the need to calculate damages rests on a determination of liability, equitable considerations favor defendants less than plaintiffs. See Story Parchment Co. v. Paterson Parchment Paper Co., 282 U.S. 555, 563, 51 S.Ct. 248, 250, 75 L.Ed. 544 (1931).[7]
Engelhard puts forth two arguments in favor of leaving specific damage determinations to a later proceeding. First, defendants strongly criticize the competence of plaintiff's proffered expert witness, John Torkelsen. Torkelsen has developed a "matrix" which, plaintiff claims, allows the jury to make a probability calculation of the number of shares involved in the class period. Second, Engelhard claims that it must be given the opportunity to rebut the presumption of reliance created by the fraud-on-the-market theory as to each class member. As a result, defendants argue that the particular award of damages should be made on the basis of more certain evidence in proceedings that permit the opportunity to rebut the claims of class members.
My decision does not turn on the reliability or admissibility of Torkelsen's testimony. Whether plaintiffs may proceed with aggregate-damage proof is a different question from whether they can convince the jury that a given sum is warranted. The dispositive issue is the effect of the presumption created by the fraud-on-the market theory. There is little point in permitting an award that assumes reliance for each class member if Engelhard must be given the opportunity to rebut reliance as to each claimant. At best, such an award would be an accurate prediction of later results. At worst, it would be a plastic number whose determination simply wasted the jury's time.
As defined by the Supreme Court, the fraud-on-the-market theory:
`is based on the hypothesis that, in an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business ... Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements.... The causal connection between the defendants' fraud and the plaintiffs' purchase of stock in such a case is no less significant *300 than in a case of direct reliance on misrepresentations.'
Basic, Inc. v. Levinson, 485 U.S. 224, 108 S.Ct. 978, 988-89, 99 L.Ed.2d 194 (1988) (plurality opinion) (quoting Peil, 806 F.2d at 1160-61). Unfortunately, the Court did not address the precise question presented here; Basic "is not to be interpreted as addressing the proper measure of damages" in Section 10b class action litigation. Basic, 108 S.Ct. at 992 n. 28.
The Court made it clear that the presumption created by the fraud-on-the-market theory is rebuttable. Basic, 108 S.Ct. at 989, 992, 993 & n. 28. Even Justices White and O'Connor, who dissented regarding the theory's application to section 10b claims, agreed with the plurality about rebutting the theory's presumption:
[I]f Rule 10b-5's reliance requirement is to be left with any content at all, the fraud-on-the-market presumption must be capable of being rebutted by a showing that a plaintiff did not `rely' on the market price.... Happily, the majority puts to rest the prospect of recovery [without actual reliance]. A nonrebuttable presumption of reliance ... would effectively convert Rule 10b-5 into a `scheme of investor's insurance.'
Basic, 108 S.Ct. at 994 (White and O'Connor, JJ., concurring and dissenting) (citations omitted) (quoting Shores v. Sklar, 647 F.2d 462, 469 n. 5 (5th Cir.1981) (en banc), cert. denied 459 U.S. 1102, 103 S.Ct. 722, 74 L.Ed.2d 949 (1983)). The Basic plurality described several examples of proof that would rebut the presumption, some of which lend themselves to class-wide, aggregate determinations.
For example, defendants could rebut the presumption as to the class by showing that "the `market makers' were privy to the truth ... and thus that the market price [was not] affected by [defendants'] misrepresentations." Basic, 108 S.Ct. at 992. Or, Engelhard could prove that the truth "credibly entered the market and dissipated the effects of the misstatements," thereby precluding "those who traded ... after the corrective statements" from claiming a "direct or indirect connection with the fraud." Id.
The Court also held that "[a]ny showing that severs the link between the alleged misrepresentation and either the price received (or paid) by the plaintiff, or his decision to trade at a fair market price, will be sufficient to rebut the presumption of reliance." Id. In this regard, the Court noted that a plaintiff's subjective and accurate belief regarding defendant's statements could destroy his chance of proving market-based reliance:
For example, a plaintiff who believed that [the defendant's] statements were false ... but sold his shares nevertheless because of other unrelated concerns ... could not be said to have relied on the integrity of a price he knew had been manipulated.
Id. Thus fraud-on-the-market reliance may be rebutted by individualized proof that focuses on a claimant's idiosyncratic investment choices. I conclude, therefore, that a mass award of damages is inappropriate.
Rule 23 "does not eliminate the ultimate need for individual proof of damages by each member of the class." Kline v. Coldwell, Banker & Co., 508 F.2d 226, 236 n. 8 (9th Cir.1974), cert. denied 421 U.S. 963, 95 S.Ct. 1950, 44 L.Ed.2d 449 (1975). The alternative to particularized awards is a "fluid recovery," in which individual claims are not determined. Instead, a sum is assessed against the defendant(s) on behalf of the "class as a whole," i.e., all those who may have been affected by the defendant's actions in the past, present or future. This money is either parcelled out to plaintiffs or used in some way helpful to them in collateral, and generally non-adversarial, proceedings. See Eisen v. Carlisle & Jacquelin, 52 F.R.D. 253, 264-65 (S.D.N.Y. 1971), rev'd., 479 F.2d 1005 (2d Cir.1973), vacated on other grounds, 417 U.S. 156, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Although the Supreme Court has declined to rule on the matter, Boeing Co. v. Van Gemert, 444 U.S. 472, 480 n. 6, 100 S.Ct. 745, 750 n. 6, 62 L.Ed.2d 676 (1980), the fluid recovery concept has been rejected by most courts. Windham v. American *301 Brands, Inc., 565 F.2d 59, 72 (4th Cir.1977) (en banc), cert. denied 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978); Van Gemert v. Boeing Co., 553 F.2d 812, 815-16 (2d Cir.1977), aff'd. 444 U.S. 472, 100 S.Ct. 745, 62 L.Ed.2d 676 (1980). The parties have argued vigorously over whether plaintiff's method of proving and recovering damages constitutes a fluid recovery. As with Torkelsen's testimony, I do not find this issue dispositive.[8]
What is dispositive is the Supreme Court's unanimous opinion in Basic that the fraud-on-the-market theory must raise a rebuttable, as opposed to conclusive, inference of reliance. If I am to follow this teaching I must allow defendants to rebut the claimed reliance of each and every class member. Otherwise proof of Jaroslawicz's own "non-rebuttable" reliance will become conclusive as to all other class members. This result would let a "`scheme of investor's insurance'" into securities law through the back door. Basic, 108 S.Ct. at 994 (White and O'Connor, JJ., concurring and dissenting) (quoting Shores, 647 F.2d at 469 n. 5).
This conclusion is also supported by decisions involving section 10b class actions. In Blackie v. Barrack, 524 F.2d 891 (9th Cir.1975), cert. denied 429 U.S. 816, 97 S.Ct. 57, 50 L.Ed.2d 75 (1976), the Ninth Circuit recognized that damages in a section 10b suit are always an individual question, but noted that plaintiff's success as to a fraud-on-the-market presumption[9] permits two kinds of rebuttal:
Defendants may [rebut] in at least two ways 1) by disproving materiality or by proving that, despite materiality, an insufficient number of traders relied to inflate the price; and 2) by proving that an individual plaintiff purchased despite knowledge of the falsity of a representation, or that he would have, had he known of it.
Id. at 906. In other words, defendants may rebut fraud-on-the-market reliance as to the class, or as to each class member.
The idea of a class-wide presumption capable of rebuttal as to individual claimants is not unique to section 10b actions. For example in Craik v. Minnesota State Univ. Bd., 731 F.2d 465 (8th Cir.1984), the Eighth Circuit addressed the problem of liability and damages in a class action suit under Title VII. The Court of Appeals required that the representative plaintiff make out a prima facie case and survive defendants' attempt to show that her proof was "`either inaccurate or insignificant.'" Id. at 470 (quoting Teamsters, 431 U.S. at 360, 97 S.Ct. at 1867). Once plaintiff succeeded, the court held, that:
not only is the plaintiff's class eligibility for appropriate prospective relief established, a prima facie case with regard to the remedial phase of the suit, in which relief for individuals is considered, is also made out. Thus, the court presumes that the employer unlawfully discriminated against individual class members.
Craik, 731 F.2d at 470. The principle has also been used in antitrust class actions. See In re Sugar Industry Antitrust Litig., *302 73 F.R.D. 322, 347 (E.D.Pa.1976) (holding that presumption of impact in Clayton Act suit is common to plaintiff class, although benefit from presumption is an individual question).
Further, it is well settled that the issue of liability may be tried separately from the damage claims of individual class members. Eisenberg v. Gagnon, 766 F.2d 770, 786 (3d Cir.1985), cert. denied sub nom. Weinstein v. Eisenberg, 474 U.S. 946, 106 S.Ct. 342, 88 L.Ed.2d 290 (1985) (stating that class decertification was inappropriate simply because reliance involved individual questions; district court could have held separate trial on reliance issues).[10] Dividing the trial will not disturb the "particularly appropriate and desirable," use of Rule 23 in section 10b lawsuits. Id. at 785. As the Blackie court noted:
The right to disprove causation [i.e., reliance] will not render the action unmanageable. A defendant does not have unlimited rights to discovery against unnamed class members; the suit remains a representative one. The district judge may reasonably control discovery to keep the suit within manageable bounds.... He may also exercise his discretion in the conduct of the trial ... [P]rocedures can be found and used which will provide fairness to the defendants and a genuine resolution of disputed issues while obviating the danger of subverting the class action....
Blackie, 524 F.2d at 906-07 n. 22. Therefore, plaintiff's arguments in favor of determining damages at the upcoming trial fall to Basic's mandate that reliance be capable of rebuttal on an individual level. I hold that damages may be determined at trial solely on a per share basis that will later be used in a separate proceeding on individual damages.
The separate proceeding will not involve all the reliance issues. I agree with Blackie that "class-wide" and "individual" rebuttals of reliance are separable events. Evidence about the market's perception of Engelhard profitability is particularly suited to the liability phase of the upcoming trial. The proof deals with the market-wide reaction to information about the company, and is therefore reflected in class-wide reliance on the price of Engelhard stock. By the same token, the evidence is intertwined with Engelhard's appeal to the "total mix" component of section 10b materiality. See Basic, 108 S.Ct. at 983 (quoting TSC Indus., Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757 (1976)). And see Jaroslawicz, 704 F.Supp. at 1305-06; Opinion filed April 5, 1989, pp. 5-11 (both discussing Engelhard's "total mix" argument). Therefore, all proof rebutting generalized issues of reliance shall be submitted to, and evaluated by, the jury.[11]
If Engelhard is found liable, separate proceedings will begin in which it will be *303 determined (a) which claimants may be denied recovery through individualized rebuttal proceedings, and (b) how much the successful claimants can recover based on the per share amount established at the liability phase. The second calculation is mechanical. The first will require the cooperation of both parties under the court's supervision. Based on the high degree of competence displayed by both pro haec vice and local counsel in this case I am confident that, should the jury require it, "procedures can be found and used which will provide fairness to the defendants and a genuine resolution of disputed issues while obviating the danger" of destroying the efficacy of the class action. Blackie, 524 F.2d at 906-07 n. 22. An order accompanies this opinion. No costs.

ORDER
This matter having come before the court on the motion of defendants, and the court having considered the written submissions and oral argument, and good cause appearing,
It is on this 19th day of June, 1989;
ORDERED that defendants' motion to dismiss plaintiff's state law claims be and hereby is denied, and it is further,
ORDERED that defendants' motion to exclude evidence relating to the SEC request for information is denied, subject to the elimination of all references to Engelhard's accounting of inventory profits, and it is further,
ORDERED that defendants' motion to reserve determination of damages to the proof-of-claim phase is granted as to proceedings to rebut individual reliance, and denied as to issues of class-wide reliance, which must be determined at the upcoming trial.
NOTES
[1] I will continue my practice of occasionally referring to the defendants as "Engelhard." The facts have been addressed in my earlier opinion denying summary judgment. See Jaroslawicz v. Engelhard Corp., 704 F.Supp. 1296 (D.N.J.1989).
[2] Engelhard's 1983 annual report was not issued until after January, 1984.
[3] See e.g., Shoppin' Bag of Pueblo, Inc. v. Dillon Companies, Inc., 783 F.2d 159, 165 (10th Cir. 1986); Angelo v. Bacharach Instrument Co., 555 F.2d 1164, 1176 (3d Cir.1977).
[4] See e.g., In re Multi-Piece Rims Prods. Liab. Litig., 545 F.Supp. 149, 152 (1982) (refusing to exclude, under Fed.R.Evid. 403, government warning to manufacturers); Lloyd v. American Export Lines, Inc., 580 F.2d 1179, 1183-87 (3d Cir.1978), cert. denied sub nom. Alvarez v. American Export Lines, Inc., 439 U.S. 969, 99 S.Ct. 461, 58 L.Ed.2d 428 (1978) (countenancing admission of Coast Guard Decision and Order of hearing held on lawsuit's subject matter under Fed.R.Evid. 803 and 804); United States v. School Dist. of Ferndale, 577 F.2d 1339 (6th Cir.1978) (reversing exclusion of evidence from H.E.W. hearing investigation concerning segregatory purpose of school, even though evidence was not collected at formal hearing).
[5] I reject plaintiff's alternative of referring to an anonymous "government agency." Engelhard has rightly pointed out that this would permit the jury to speculate wildly as to whether the "agency" was, say, the Justice Department or a mythical entity which only investigates clear cases of fraud.
[6] Not only is this matter irrelevant because plaintiffs have withdrawn their claims regarding it, it also carries the potential for prejudice and waste of time at trial. Although the court's instruction will remove any prejudice relating to the fact of the SEC's inquiry, references to the inventory matter might well lead the jury to speculate on the possibility of other "violations" which have not been formally placed before them.
[7] In Story Parchment the Supreme Court stated that, "[w]here the tort itself is of such a nature as to preclude the ascertainment of the amount of damages with certainty, it would be a perversion ... [to] relieve the wrongdoer from making any amend of his acts.... In such case ... it [is] enough if the evidence show the extent of the damages as a matter of just and reasonable inference." Story Parchment, 282 U.S. at 563, 51 S.Ct. at 250. A similar holding was made in In re Antibiotic Antitrust Actions, 333 F.Supp. 278 (S.D.N.Y.1971), wherein the court rejected the defendants' "unmanageability objection" to class certification by stating that if "a price-fixing conspiracy is proven ... the success of their scheme ... would certainly be no basis for leaving the money in their hands." Id. at 287. Class action liability depends on finding that a defendant has hurt a large number of people; a defendant's claims of inconvenience or inexactitude in fixing damages must be considered, in effect, complaints about his own conduct.
[8] I am, however, of the opinion that plaintiff's offer is not an attempt to make a fluid recovery. Under plaintiff's scheme, the damage fund would correspond to an approximate number of "injured" shares. Class claimants would recover from this fund and, presumably, surplus funds would be returned to defendants. Fluid recovery is not marked by imprecision, nor by the fact that the entire recovery does not ultimately reach claimants. Rather, it is marked by a complete divorce from individualized methods of proof, and by a disturbing tendency toward the wholesale redistribution of money for the "common good." Further, even were plaintiff able to obtain a fluid recovery I would still grant defendants' motion due to the concerns discussed infra.
[9] The Blackie court couched its discussion of reliance in terms of a collapsed "materiality/transactional causation" showing. The Ninth Circuit also stated, however, that:

Materiality circumstantially establishes the reliance of some market traders and hence the inflation in the stock price  when the purchase is made the causational chain between defendant's conduct and plaintiff's loss is sufficiently established to make out a prima facie case [of securities fraud].
Blackie, 524 F.2d at 906. As the Supreme Court noted in Basic, this is essentially the fraud-on-the-market theory. Basic, 108 S.Ct. at 992 n. 25.
[10] See also Windham v. American Brands, Inc., 565 F.2d 59, 71-72 (4th Cir.1977) (en banc), cert. denied 435 U.S. 968, 98 S.Ct. 1605, 56 L.Ed.2d 58 (1978) (holding that bifurcation is appropriate where it "could remove or even alleviate" an "overwhelming burden of damage mini-trials"); Kline, 508 F.2d at 236 (discussing reference of damages to special master after trial of liability). And see Shamberg v. Ahlstrom, 111 F.R.D. 689, 698 (D.N.J.1986); In re Sugar Industry Antitrust Litig., 73 F.R.D. 322, 355 (E.D.Pa.1976); Milberg v. Lawrence Cedarhurst Fed. Sav. & Loan Ass'n., 68 F.R.D. 49, 52 (E.D.N.Y.1975); Partain v. First Nat'l. Bank, 59 F.R.D. 56, 59 (M.D.Ala.1973) (all four cases approving of separation where appropriate).
[11] This structure will not prejudice plaintiff's direct-reliance claims under New Jersey law. Once fraudulent conduct is found, reliance proofs may proceed in the claim phase together with federal-law claims. At the same time, however, an aspect of Basic deserves some discussion.

One cannot imagine business conduct that would support fraud-on-the-market recovery while denying direct-reliance recovery. At the same time, one can imagine conduct which would not support fraud-on-the-market recovery and still violate direct-reliance principles. The Supreme Court, however, has held as a matter of law that "`in an open and developed securities market, the price of a company's stock is determined by the available material information.'" Basic, 108 S.Ct. at 989 (quoting Peil, 806 F.2d at 1160-61). Therefore, where claims are brought for both direct- and fraud-on-the-market reliance, plaintiff's failure to pass fraud-on-the-market muster means that a defendant's conduct did not deceptively alter the stock's price: The remaining direct-reliance claims involve damnum sine injuria.